Willie Samuel **RIVERS**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 25549.

United States Court of Appeals
Fifth Circuit.

Sept. 16, 1968.

Jaffe, The Judicial Enforcement of Administratve Orders, 76 Harv.L.Rev. 865 (1963).

James M. Pace, Jr., Bainbridge, Ga., for appellant.

Walker P. Johnson, Jr., Asst. U. S. Atty., Macon, Ga., for appellee.

Before JOHN R. BROWN, Chief Judge, BELL, Circuit Judge, and HOOPER, District Judge.

JOHN R. BROWN, Chief Judge:

Appellant was convicted of violating 18 U.S.C.A. § 2114 [1] for attempted rob-

---

1. 18 U.S.C.A. § 2114 provides that:
"Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years."

bery of a rural mail carrier and was sentenced to twenty-five years in prison. The twenty-five year sentence required a finding in this case that in committing the robbery Appellant wounded the victim. He contends on appeal that statements he gave to state and federal officers while in custody and admitted into evidence against him were not voluntary, that the statements led to the recovery of evidence which was improperly admitted, and that the statements were not properly adjudged voluntary in accordance with Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. After close examination of the record, we are compelled to conclude that fundamental error of constitutional proportions of the *Wade-Gilbert-Stovall* type, not raised at trial or on appeal, was committed by allowing testimony into evidence regarding an out-of-court identification of the accused while he was unrepresented by counsel. We thus vacate and remand for further proceedings.

The facts are not complicated. On August 29, 1967—the date is important— James Moore, a rural mail carrier, delivered a C.O.D. parcel to a residence in Seminole County, Georgia. The charge was $20 and the package was addressed to Alvin Hopkins. Alvin paid for the package, and Moore observed a second young man with Hopkins at that time. Later, as Moore drove down the road, that second man stopped him and asked for stamps. Moore handed him the stamps and when he turned his back to reach into a change box, he heard an explosion and felt something strike him in the back of the head. Looking around, Moore saw the young man, positively identified at trial by Moore as the same man as the Appellant here,[2] standing by the car with a pistol in his hand. Seriously but not fatally wounded, Moore managed to drive away to get help. Moore proceeded to a house over a mile away, bleeding profusely all the way. He stopped his car and got a friend, Wilford Tyler, to take him to a nearby doctor.

Tyler then left Moore and the doctor and went into Donaldsonville, Georgia, to inform local authorities that a shooting had occurred. Sheriff White was summoned and he went immediately to find Moore. Sheriff White found Moore at the local hospital and was told that the assailant was "one of the boys out at Ish Hopkins." The Sheriff and other officers hurried out to the Hopkins' home and there apprehended Appellant and his cousins the Hopkins twins, Alvin and Calvin. Thus far all is in order, but then the Sheriff, who was hardly one expected to read the latest advance sheets of Supreme Court opinions, especially three then scarcely two months old, told the other officers to take the three young men to the hospital to let Moore identify the gunman.

Just as the carload of officers and suspects arrived at the local hospital, Moore was being placed in an ambulance for transportation to another hospital in Columbus, Georgia. The events that then transpired are revealed in Moore's testimony:

"A After I got to the doctor and they placed me in the ambulance, Carl Thompson and Morris Stewart, GBI Agent Morris Stewart, drove up at the hospital beside the ambulance and pulled Mr. Rivers out of the car and showed him to me.

A At the box when I got there.
Q Is * * * Willie Rivers * * * in the courtroom?
A Mr. Rivers is, yes.
     *      *      *      *      *
Q Will you point him out to the jury, please?
A Yes, Mr. Rivers sitting over here in the middle (pointing to Defendant) * * * "

2. The in-court identification procedure is revealed in the following testimony elicited from Moore by the prosecutor:
    "A * * * I come around a little curve just before I get to the [mail] box and Alvin and Willie Rivers were at the box when I got there.
    Q You say Alvin and Willie Rivers were there?

Q Did they just pull him out? Was he by himself?

A No, they pulled another one of the twins out with him; and I told Carl when he pulled him out of the car and when he started to get the other man, 'I said Carl there's no use, this is the man that shot me here.'

Q Pointing to whom?

A Mr. Rivers.

Q Willie Samuel Rivers?

A Yes sir.

Q Did you say anything else to him?

A I said, 'Why did you shoot me?'

Q Did he say anything to you?

A He said 'I ain't shot you.'

\* \* \* \* \* \*

Q What, if anything, did you say concerning the other boy or boys, young men that were there? Who was that Calvin and Alvin Hopkins?

A That's right. Well, when they brought one of the twins out of the car, I don't know which one it was, I told him, I said 'There's no use in pulling anybody else out of that car.' I said 'I know this is the boy that shot me.'

Q Then, you were taken to Columbus; is that correct?

A That's right."

After this identification, Sheriff White ordered that the three young men be taken into town and placed in the county jail so they could be questioned. Each of the young men was given the required *Miranda* warnings which were read to them from a printed card. Appellant, 18 years of age with an eleventh grade education, indicated he understood his rights and didn't want a lawyer. The Hopkins boys were questioned first, then Appellant was questioned, but he volunteered nothing. Persisting in his efforts, the Sheriff asked, "Didn't Mr. Moore, the rural mail carrier, point his finger in your face and ask you why you shot him?" and "Don't you think Mr. Moore knows who shot him?" In spite of this, Appellant continued to assert his innocence.

Changing his tack, the Sheriff then called the Hopkins boys' aunt and had her come down to the jail. She told her nephews that if they didn't tell the truth, "you'd better not come back to my house, if he [the Sheriff] don't kill you or get you, I will." After their aunt left, the Hopkins boys, anxious to be released, pressured Appellant to tell the Sheriff what had happened since Moore "had done picked him out." The Sheriff was called to the cell, and Appellant then admitted that he had shot Moore to get the money but insisted that he had used a rifle. On the Sheriff's own description, Appellant was emotionally upset, crying and the like, at this time.

Three days later, presumably in order to clear up some discrepancies in Appellant's oral statement to the Sheriff, but more probably to get a written statement, a Postal Inspector interviewed Appellant. Before this was done Appellant was again fully advised of his *Miranda* rights. However, the Postal Inspector also showed Appellant 18 U.S.C.A. § 1001, which deals with penalties for making false statements. In this interrogation the Inspector elicited a signed statement in which Appellant admitted (as he had orally to the Sheriff) shooting Moore, but continued to insist that he had used a rifle instead of a pistol. Still not satisfied with Appellant's statement since all the evidence suggested the use of a pistol, the Inspector repeated five days later the identical procedure he used during his first interview with Appellant and obtained a statement acknowledging that the weapon used was a pistol, not a rifle, and this led to the recovery of the pistol used in the assault.

At trial, the District Judge determined that all the admissions and the gun were admissible over Appellant's objections. No objection was made to Moore's ambulance stretcher out-of-court identification of Appellant. Although some testimony about the existence of confessions was admitted prior to the jury's being excused, the Judge did not allow the jury to hear any part of them until a hearing was conducted outside the jury's pres-

ence and he concluded that the statements were voluntary. No objection was made to this procedure.

■ Generally courts are not disposed to consider errors which have not been brought properly to their attention, but "we may, however, carefully examine the entire record to determine whether it reveals plain errors affecting substantial rights noticeable under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S. C.A." Rogers v. United States, 5 Cir., 1962, 304 F.2d 520, 522; Smith v. United States, 1962, 118 U.S.App.D.C. 235, 335 F.2d 270, 274; cf. Amos v. United States, 1921, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654. Cautious as we are, and should be, in taking such a course, we feel that plain error of constitutional proportions was committed at this trial. Spectacular as it was, and so evident on the face of the record so that it is bound to be brought up later, we think it equally appropriate to consider it at this time. See Alexander v. United States, 5 Cir., 1968, 390 F.2d 101, 103 n. 3.

It is an understatement, of course, to say that the rights of a criminal defendant in pre-trial proceedings have expanded greatly in just the last few years.[3]

But in no area of the law was the development quicker, more startling, and perhaps more unexpected than the recent decisions regarding the right to counsel during pre-trial out-of-court identification procedures and confrontations between suspects and witnesses.[4]

■■ The decisions of the Supreme Court in *Wade*[5] and *Gilbert*[6] put it in terms of right to counsel. They held that confrontations between suspects and witnesses were a "critical stage" of the criminal proceedings against an accused and counsel must be present at these confrontations unless waived.[7] With *Miranda* on the books, it is indisputable that most, perhaps all, confrontations occurring after arrest will fall within the rules announced in *Wade* and *Gilbert*. We recognize the risk of ever letting a dissenter speak momentarily for the Court as to what it has really held, but Mr. Justice White, dissenting in *Wade* said "the rule applies to any lineup, to any other techniques employed to produce an identification and a fortiori to a face-to-face encounter between the witness and the suspect alone, regardless of when the identification occurs, in time or place, and whether before or after indictment or information."[8]

3. See, e. g., Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; White v. State of Maryland, 1963, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193; Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114.

4. In Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, the Court recognized that the law enforcement officials of the Federal Government and all 50 states had proceeded on the assumption that counsel was not necessary at a lineup or an out-of-court confrontation. Standing by itself, alone and unaided by specific precedent, was the decision of this Court in Wade v. United States, 5 Cir., 1966, 358 F.2d 557. It foreshadowed a reversal in the line of decisions. Our decision in *Wade* led one commentator to recommend with prescience that "to prevent the violation of [constitutional] rights, the police

must warn an accused of his right to counsel before any [identification] procedures are conducted." See Comment, The Right to Counsel During Police Identification Procedures, 45 Texas L. Rev. 504, 527 (1967).

5. United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

6. Gilbert v. State of California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed. 2d 1178.

7. These cases were ruled to be prospective and apply only to confrontations, not trials, occurring after June 12, 1967. Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Pearson v. United States, 5 Cir., 1968, 389 F.2d 684; Crume v. Beto, 5 Cir., 1967, 383 F.2d 36.

8. United States v. Wade, supra, 388 U.S. at 251, 87 S.Ct. at 1944, 18 L.Ed.2d at 1171.

Any suggestion that the rules announced apply only to formal lineups is seriously weakened by *Stovall*.[9] In that case the suspect was taken to a hospital, before arraignment, for possible identification by the victim of an assault. Although the Court expressly declined to apply the *Wade-Gilbert* rules retroactively—so that Stovall got no benefit from them—this is a long way from holding that hospital-stretcher identification is beyond *Wade-Gilbert*. Such a conclusion would be to suggest that the Supreme Court emphasized the absence of formalized police procedure and the absence of an indictment or formal charge to the point that its action in *Stovall* was nothing more than an advisory opinion on the retroactivity of those cases. We decline to impute this to the Court.[10]

■ What does this mean in this case? Of course we have no retroactivity problem for the identification confrontation took place August 29, 1967, nearly three months after the June 12, 1967,[11] application of *Wade-Gilbert*. On this undisputed record we hold that Appellant should have been warned of his right to counsel prior to the confrontation, and absent an intelligent waiver, evidence of the identification should not have been admitted.

All three young men in the police car were under arrest. A significant lapse of time had passed since the assault on Moore. Although much of this assault, Moore's physical indifference to a gunshot wound to the skull, and his ability to make an eyeball-to-eyeball identification of his lethally armed assailant is most unusual, the fact is that this record does not reveal that any emergency existed or that the police feared Moore was dying.[12] Certainly no absolute necessity for this immediate confrontation was established by this limited record. To the contrary, so far as the present record goes, there was time to provide counsel (or establish a purposeful waiver) and with counsel (or waiver) a lineup could have been held at the hospital with proper procedural safeguards.

The inherent dangers of impromptu identifications such as the one here are well-documented in *Wade*, and we see no need to go into them again. The opportunity for suggestive practices, either accidental or intentional, are ample. To the usual hazards must be added here the special danger to reliable identification from reliance on the judgment of a man just shot in the back of the head. The rationale behind requiring counsel the next day at the hospital during a more

---

9. See also Biggers v. Tennessee, 1968, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267, aff'g by an equally divided court, Biggers v. State, Tenn.Sup.Ct., 411 S.W. 2d 696. In that pre-*Wade* case Mr. Justice Douglas said, in dissenting from denial of relief, that if the same procedure used in *Biggers* for identification (single suspect exhibited immediately after arrest to woman he allegedly raped seven months previously) had occurred after June 12, 1967, it would have "of course" violated the *Wade-Gilbert* rules.

10. What confronts us is so far removed from the fact situation presented in Wise v. United States, 1967, 127 U.S. App.D.C. 279, 383 F.2d 206, cert. denied, 1968, 390 U.S. 964, 88 S.Ct. 1069, 19 L.Ed.2d 1164, that we express no opinion on it. In that case a housebreaker was caught in the act, pursued by the homeowner, and apprehended without ever having lost sight of him. The suspect was returned to the house

for voice identification by the homeowner's wife, who had heard his voice but had not seen his face. We need not, and do not, decide whether this would be permissible. The District of Columbia Court did not decide the issue since the confrontation took place before *Wade-Gilbert*.

11. And in light of the holding in *Stovall*, the procedure used here could not be held to be so unfair as to amount to a violation of due process. Crume v. Beto, 5 Cir., 1967, 383 F.2d 36.

12. Cf. Stovall v. Denno, supra. Whether an absolute necessity for speed would create an exception to *Wade-Gilbert* rules may well be doubtful in light of the Court's language in *Wade* that the right to counsel cannot be brushed aside because a lawyer may cause obstruction and delay. United States v. Wade, 388 U.S. at 237–238, 87 S.Ct. at 1937–1938, 18 L.Ed.2d at 1163.

formalized proceeding, cf. *Stovall,* is just as compelling or more so under the facts here. Since in *Gilbert* the Court held that to deter improper police conduct only a per se exclusionary rule applied to testimony about an illegally conducted identification would be effective,[13] we must vacate the judgment and conviction and remand the case to the District Court.

But this remand does not necessarily forecast a new trial. Although the testimony by Moore about the hospital confrontation "is the direct result of the illegal lineup 'come at by exploitation of [the primary] illegality,' Wong Sun v. United States, 371 U.S. 471, 488 [83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455] * * * [and the Government] is therefore not entitled to an opportunity to show that that testimony had an independent source," Gilbert v. State of California, 388 U.S. at 272–273, 87 S.Ct. at 1956, 18 L.Ed.2d at 1186, the Trial Judge may still be able upon reconsideration to "declare a belief that [the error] was harmless beyond a reasonable doubt." Chapman v. State of California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711. Also, the Trial Judge must satisfy himself that the in-court identification of Appellant by Moore—not testimonially related to the occurrence of the confrontation or as a product thereof—was either harmless error or arrived at independent of the primary illegality and was untainted by it.[14] The tests to

---

13. Cf. Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. This same rule was advocated earlier as the only proper one, see Comment, The Right to Counsel During Police Identification Procedures, 45 Texas L.Rev. 504, 524–25 (1967).

14. In light of the testimony by Moore at trial concerning his ample opportunities to observe Appellant, it is impossible for us to say as a matter of law that the identification testimony was either harmful or tainted by the primary illegality. The following testimony was elicited by the Prosecutor from Moore:

"A * * * Before I got to the box I blew the horn of the car; when I blew the horn of the car, I come around a little curve just before I get to the box, and Alvin and Willie Rivers were at the box when I got there.

Q You say Alvin and Willie Rivers were there?

A At the box when I got there.
* * * * *

Q Now, was anybody—who, if anybody, was with him, Alvin Hopkins, at the time you delivered the package and received the payment for it?

A Just Rivers; he was the only one.
* * * * *

Q How many times had you seen him; do you recall?

A I don't recall ever seeing him before.
* * * * *

Q Who paid you the $20?

A Alvin handed me a $20 bill and turned to Mr. Rivers and asked Mr. Rivers if he had a dollar; and he said yes, and he reached in his pocket to get the dollar and, when he reached to get the dollar, he said 'No', said 'I've got 35 cents in my pocket', said 'I'll give it to him myself'; and he reached in his pocket and held out approximately 40 cents in change; and I took the 35 cents out of the change myself. He just held it out there for me to get and I took it out of his hand myself.
* * * * *

Q All right, and you went on to whose house?

A Gene Barber's residence.

Q And then did you come back up the road the same way you had been?

A It's sort of like a horse-shoe, I mean coming out; you go down the highway maybe a tenth of a mile and then turn back to Barber's house, sort of like a horse-shoe; and I went back to the Barber house and came back up; and when I came up Willie Samuel was running across a ditch there about, oh it must have been about half-way, he run across the ditch with his hand up for me to stop.

Q This same Willie Samuel Rivers?

A That's right.

Q Now, what did you do then?

A I stopped in the middle of the highway; I looked back to see that there was no one behind me

be applied in this determination are outlined in *Wade,* 388 U.S. at 241, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165.[15]

██ Since Appellant may possibly have to be retried, sound judicial administration dictates that we make some additional comments on problems that arose at this trial that may arise again. See Clifton v. United States, 5 Cir., 1965, 341 F.2d 649. Appellant basically has three separate arguments that he urges upon us now [16] on appeal, all of which go to

and there were no cars coming and I stopped in the middle of the highway; and he came around back of my car because the only window I had down was on my side of the car; and he walked up side of the car and told me to give him three stamps; and I told him just way of conversation, I said 'I was coming right back by your house.'

Q How far away from the house or the mail box were you at this time?

A Oh, I'd say about two dozen feet at the most.

Q All right, you told him you were coming right by the house?

A And he told me to give him three stamps; I gave him the three stamps and he gave me a dollar bill; and when he gave me the dollar bill, I've got a little steel box that sits right next to me that I keep bills in that belongs to me or belongs to the Post Office Department rather; and I stuck that bill-fold in the little steel box and turned to get his change; and when I turned to get his change, I heard something 'POW' right in the back of the head there.

Q What do you remember after you heard that?

A Well, the next thing I remember was putting my hand to the back of my head. I didn't know what had happened. The next thing I remember I put my hand to the back of my head there; and when I put my hand to the back of my head, it came down full of blood.

Q What did you do?

A I looked around and Mr. Rivers was standing side of the road trying to turn the cylinder on the pistol; and I realized the best thing for me, I had no protection whatsoever, and I realized the best thing for me to do was to get away from there as quick as possible. And my car was choked down and I cranked the car up and left and drove a mile and 6/10 to Wilford Tyler's house and he took me to the doctor.

Q Now, after you turned around after you saw the blood and you state that you saw the defendant, Willie Samuel Rivers, with a pistol in his hand; is that correct?

A That's right.

Q What did the pistol look like?

A It was just a small pistol; that's all I can remember now.

Q Does that look like the pistol? Can you identify that?

A I couldn't say for sure, I sure couldn't because I didn't get that close to look at it. I realized what he was doing and I realized what I had better do.

Q But you looked around and you saw him with a pistol, whether it was this one or not?

A That's right.

Q And he was working with the cylinder? Is that correct?

A That's right, working with the cylinder."

15. "Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

16. We emphasize "now" as these are appellate afterthoughts since the objection on the trial to the confessions was only that Appellant did not have an attorney, that he did not clearly understand what it meant to have an attorney, and did not understand what results the waiver would have. No objection was made on the basis that a young man of 18 is too young to waive his rights intelligently, nor that the Trial Judge admitted the confessions before the jury without

the admissibility of the out-of-court statements. First, Appellant seems to argue that we should hold as a matter of law that any statement given by a young man eighteen years old without having counsel present is inadmissible because such a person, absent express advice from a lawyer, simply cannot make an intelligent choice, hence, waiver. We decline to do so. Of course the youth and inexperience of a criminal suspect may bear on whether a valid waiver was made, but apart from age we find no other basis for holding an error was committed in admitting these statements since Appellant was fully warned of his right to counsel by the appropriate warnings as set out in Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; see Fritts v. United States, 5 Cir., 1968, 395 F.2d 219. As to the age aspect the record shows that Appellant had an eleventh grade education, was literate, and his actions indicated to others that he seemed to understand the warnings. Exercising his right he did not take the stand nor did he offer any testimony by others. Thus, there was simply nothing by cross-examination or otherwise which reflected on the capacity to understand and act intelligently.[17]

■ Second, Appellant challenges the Postal Inspector's use of 18 U.S.C.A. § 1001 as an inducement to tell the truth. His theory is that although this statute does not purport to make the statements inadmissible it has often been construed as not applying to statements made to officers during interrogation.[18] This use of § 1001 merely emphasized that if Appellant was going to say anything, he had best tell the truth. No one made any intimation that Appellant had a duty to

speak or that the statute placed such a duty upon him. Nothing in the statute was used as a coercive instrument to get Appellant to talk or confess. With Miranda awareness of his rights to remain silent, to have counsel, and his willingness to talk, he had no constitutional right to lie and an officer's admonition to tell the truth, whether based on morals or even misguided notions of statutory prohibitions, does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary.

■ Third, Appellant contends that the requirements of Jackson v. Denno, supra, were not satisfied in two respects. The first is that the Trial Judge determined voluntariness without looking at or reading the confessions themselves. So far as warranting reversal goes, the record does not bear this out, and no discussion is called for as to any retrial since, if the statements are again offered, the record can be made clear that the Judge has looked at them in making his prior independent determination of voluntariness. The second prong of the attack is that the Judge allowed evidence of confessions to get to the jury before voluntariness was established. The record shows, however, that although some evidence concerning Miranda warnings having been given was introduced before the Judge excused the jury, the jury was withdrawn, and an extended examination was conducted with the Judge then making his voluntariness determination before the jury heard, saw or read the confessions. What Jackson v. Denno, supra, aimed at, was first, the vice in allowing the jury to decide both voluntariness of the confession and guilt simultaneously, and second, requiring a prior

having examined them, nor that the proceedings were not being carried out in accordance with Jackson v. Denno.

17. Nothing we say here concerning the admissibility of the statements over the limited objection made by counsel would necessarily foreclose a reconsideration

of voluntariness and admissibility by the Trial Judge on any additional grounds that may be urged in case a retrial becomes necessary.

18. See Paternostro v. United States, 5 Cir., 1962, 311 F.2d 298; United States v. Moore, 5 Cir., 1950, 185 F.2d 92.

**944**

independent determination by the Judge outside the presence of the jury that the out-of-court statement was voluntary. These objectives were satisfied here.

Reversed and remanded.