**Jimmie Curtis ROPER**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections.**

**Civ. A. No. 5104.**

United States District Court,
E. D. Texas,
Tyler Division.

Sept. 30, 1970.

Thomas Hathaway (court appointed), Tyler, Tex., for petitioner.

Dunklin Sullivan, Asst. Atty. Gen., Austin, Tex., for respondent.

### MEMORANDUM OPINION

JUSTICE, District Judge.

This federal habeas corpus proceeding collaterally challenges the state criminal conviction of Jimmie Curtis Roper on the ground that his station house identification by the prosecutrix "was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law." Stovall v. Denno, 388 U.S. 293 at 302, 87 S.Ct. 1967 at 1972, 18 L.Ed.2d 1199 (1967).

For the purposes of this action, the following facts are relevant:

On the afternoon of Friday, October 26, 1962, in Tyler, Texas, a young secretary returned to her apartment after work. Upon entering and closing the door, she was grabbed from behind by a man wielding a knife. She was then blindfolded and bound to the bed. After being disrobed and raped, she was engaged in conversation by her assailant. Because of the circumstances of the attack, the young secretary was unable even to attempt an identification of the person who raped her, but she was in a position to try to identify his voice. On Monday, October 29, 1962, at approximately 9:30 P.M., the petitioner was arrested as a suspect and taken to the police station. While being interrogated by Detective Richard Grimes at the station, petitioner unknowingly was being subjected to the identification procedure challenged in this action. A few feet away outside a door left ajar, the complainant was listening with Detective Herbert Isham to the interrogation going on in the office. She identified the voice of the petitioner, who was never advised that the prosecutrix was listening, and in court she unequivocally reaffirmed her pre-trial recognition. The following morning, Tuesday, October 30, 1962, petitioner gave a confession which, though attacked in a habeas corpus pro-

ceeding prior to the instant one, has been held to have been legally voluntary. Roper v. Beto, Civil No. 4810, Tyler Division (E.D.Tex. Jan. 12, 1968).

The two basic issues which the court must decide are succinctly stated in petitioner's memorandum brief as:

1.  whether petitioner's constitutional rights were violated by the pretrial identification process, thereby rendering testimony concerning the station house identification constitutionally inadmissable; and

2.  assuming that a constitutional error was committed by the introduction of testimony concerning the pre-trial identification, whether such error was harmless under the rule of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967).

United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) fashioned

> "exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel." *Stovall,* supra, 388 U.S. at 297, 87 S.Ct. at 1970.

For identification procedures occurring before these decisions, the condition requisite for exclusion is whether "the confrontation resulted in such unfairness that it infringed * * * [the defendant's] right to due process of law." *Stovall,* supra, 388 U.S. at 299, 87 S.Ct. at 1971. In announcing this principle, the Supreme Court cited with approval Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966), a case remarkably comparable to the present one.

The identification process in *Palmer,* supra, as in the instant case, consisted of having the prosecutrix listen through a partially open door to the suspect being questioned in an adjoining room. The court in *Palmer,* supra, 359 F.2d at 201–202, noted that

> "Where the witness bases the identification on only part of the suspect's total personality, such as * * * voice alone, prior suggestions will have most fertile soil in which to grow to conviction. This is especially so when the identifier is presented with no alternative choices; there is then a strong predisposition to overcome doubts and to fasten guilt upon the lone suspect.

> * * * * * *

> "Where the identification is by voice alone, the absence of some comparison involves grave danger of prejudice to the suspect, for as one noted commentator has pointed out:

>> '[E]ven in ordinary circumstances, we must be cautious and accept only with reserve what a witness pretends to have heard. All the more must it be so if there are special difficulties in the way—if, for example, the voice comes from a great distance, if it is shrill, muffled, or presents any other peculiarity. The same is true if the person whose voice has been heard is of a different nationality from the listener, if he speaks another dialect, or is better or less educated. Criminal Investigation, Jackson ed. (5th ed. 1962), at 41–42' "

In *Palmer,* supra, as in the instant case, the prosecutrix did not see the face of an attacker who was in her presence for several minutes. Likewise, within a couple of days she was taken to the police station and asked to identify the voice of a lone suspect.

> "When she was asked if she could identify the voice, the only voice that was submitted for identification, the highly suggestive atmosphere that had been generated could not have failed to affect her judgment.

> * * * * * *

> "In their understandable zeal to secure an identification, the police simply destroyed the possibility of an objective, impartial judgment by the prosecutrix as to whether Palmer's

voice was in fact that of the man who had attacked her. Such a procedure fails to meet 'those canons of decency and fairness' established as a part of the fundamental law of the land. A state may not rely \* \* \* on an identification secured by a process in which the search for truth is made secondary to the quest for a conviction." *Palmer*, supra, 359 F.2d at 201, 202.

■ Just as testimonial untrustworthiness is a reason for excluding coerced confessions, so the likelihood of testimonial error is a basis for proscribing irregularly obtained identifications. The principles enunciated in *Palmer* illuminate a number of factors which lead to the inescapable conclusion that, in the light of "the totality of the circumstances surrounding", *Stovall*, supra, 388 U.S. at 302, 87 S.Ct. at 1972, his identification, petitioner was deprived of the fundamental fairness that due process demands.

For example, the record does not reveal either that the complainant volunteered or that the police sought any characterization of the voice of the assailant; thus reliance was placed on the prosecutrix' memory, rather than on a description contemporaneous with the attack. See 3 Wigmore (3rd ed. 1940) 164, § 786a. Also, it should be noted that since the prosecutrix was English, some of the dangers of voice identification, referred to in the material quoted above from *Palmer*, were inherent in this situation. Moreover, the complainant was brought to the station in an expectant frame of mind. The police had *a* suspect whose voice they wanted her to identify. Such singling out necessarily suggested that *the* suspect was thought by the police to be the culprit. In addition, no countervailing compulsion for the adoption of a hasty and objectionable identification process existed. Unlike *Stovall* itself, there was no danger here that the victim would die without having identified or exonerated a prime suspect. Nor, as was the case in Simmons v. United States, 390 U.S. 377, 88 S.Ct.

967, 19 L.Ed.2d 1247 (1968), where photographs of suspects were shown to witnesses of an armed bank robbery, was there any danger that the alleged perpetrator of a serious felony would escape.

There is no doubt that the instant case is, as Judge Wisdom said of "Palmer v. Peyton, 4 Cir. 1966, 359 F.2d 199 (en banc), \* \* \* an example of an outrageously improper identification." Crume v. Beto, 383 F.2d 36 at 39 (5th Cir. 1967).

An additional factor that compounds the unconstitutional impropriety of petitioner's identification should be highlighted. *Wade* and *Gilbert*, supra, were in fact lineup situations, which turned upon the meaning of the Sixth Amendment's confrontation clause. In *Simmons*, supra, which applied the *Stovall* standards, as in two cases cited in the State's brief, United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970) and United States v. Zeiler, 296 F.Supp. 224 (W.D. Pa. 1969), photographs of suspects were shown to witnesses. In the instant case, as in *Palmer*, supra, there was not only nothing approximating a lineup, there was also no semblance of a confrontation of the suspect by the complainant. Moreover, unlike the cases involving the exhibition of photographs, where at least the whole physiognomy was subject to scrutiny, in the present case the complaining witness' attention was concentrated on the one and only "mark" by which the prosecutrix could hope to identify the assailant. See 2 Wigmore (3rd ed. 1940) 385–358, § 411, and 3 Wigmore (3rd ed. 1940) 163, § 786a.

The inherent unreliability of a single suspect confrontation, which Justice Douglas described in an opinion dissenting from the judgment of an equally divided court in Biggers v. Tennessee, 390 U.S. 404 at 407, 88 S.Ct. 979 at 981, 19 L.Ed.2d 1267 (1968)—

"Whatever may be said of lineups, showing a suspect singly to a victim is pregnant with prejudice. The message is clear; the police suspect *this*

man. That carries a powerfully suggestive thought. Even in a lineup the ability to identify the criminal is severely limited by normal human fallabilities of memory and perception. When the subject is shown singly, havoc is more likely to be played with the best intended recollections."—

is aggravated in the circumstances of a single suspect *voice* identification. The Supreme Court later approved this language in Foster v. California, 394 U.S. 440 at 443, 89 S.Ct. 1127 at 1129, 22 L. Ed.2d 402 (1969), where it is held that such focusing of attention on one suspect "so undermined the reliability of the eyewitness identification as to violate due process."

Some comment should be made concerning the contentions in the State's answer and brief with regard to the complainant's in-court testimony concerning her pre-trial identification of petitioner's voice. Though the State correctly noted that complainant's recognition of petitioner's voice was strong, it then argued that whatever taint resulted from her in-court testimony as to the identification was removed by her admission that she could not swear that petitioner was the man who raped her. If the implicit import of this contention were accurate, the validity of petitioner's constitutional attack might perhaps be seriously weakened. However, the spurious character of the State's argument is crystalline from even a cursory examination of the record. Since no confrontation ever occurred, the State had to prove up the identification process challenged here by testimony from both the officers and the prosecutrix. Of course, she could not recognize Mr. Roper by his appearance, because she had not seen him before the trial; but the record clearly reveals that she did not swerve from her firmly believed recognition.

"Q. The voice you heard at the police station that you testified to about, I will ask you again, did you identify that voice as the same voice of the person that assaulted you on the 26th of October?

A. Yes, sir, I did.

Q. Do you now believe that that was the same voice?

A. Yes, sir, I do.

Q. And that was the voice of the person who has been identified to you now as this defendant, Roper?

A. Yes, sir." Statement of Facts 96.

Thus, it is necessary for this court to decide whether the erroneous admission of the impermissibly adduced identification had a prejudicial effect on the outcome of petitioner's trial. One court has urged, in a situation where the evidence made out an ironclad case but where the identification itself was weak, that

"Normally, an * * * identification by the complaining witness will not meet the *Chapman* standards for harmless constitutional error." Solomon v. United States, 133 U.S.App. D.C. 103, 408 F.2d 1306 at 1309 (1969).

In the precursory decision of Fahy v. Connecticut, 375 U.S. 85 at 86–87, 84 S.Ct. 229 at 230, 11 L.Ed.2d 171 (1963), the Supreme Court said

"We find that the erroneous admission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the error was not harmless, and the conviction must be reversed. We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."

Elucidating this holding, in *Chapman*, supra, 386 U.S. at 24, 87 S.Ct. at 828, the Supreme Court stated

"There is little, if any, difference between our statement in Fahy v. Connecticut about 'whether there is a rea-

sonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

Hence, in order to determine if the constitutional error in this case is of such a magnitude as to require automatic reversal of the conviction, an examination must be made of the evidence linking the petitioner with the commission of the crime. Various facts are recited in the State's brief as supportive of the jury's finding petitioner guilty. While facts such as the result of the doctor's examination of the prosecutrix and the photographs of the condition of her apartment are undoubtedly confirmative of the occurrence of the criminal assault, nevertheless, to conclude that this evidence was independent corroboration that petitioner committed the assault would be specious indeed. Moreover, the State's assertion that the testimony concerning recovery of a knife from petitioner's apartment provided evidence which connected him to the crime is readily belied by the record, which reveals that the able trial judge correctly instructed the jury not to consider the very answer which the State cites to this court as a basis for its assertion. Statement of Facts 41. Therefore, the only remaining link between the petitioner and the rape is his confession.

Though that confession has been decisively held to have been voluntary, no jurisprudential edict compels a jury to accept a confession as conclusive evidence of guilt. Indeed the Fifth Circuit has recently noted that

"We have approved both the Wigmore and the Massachusetts rule [sic] * * The Wigmore rule leaves admissibility to the trial judge and credibility and weight, if the confession is admitted, to the jury. * * * Under the Massachusetts rule, both the trial judge and the jury pass on the question of voluntariness." Fisher v. United States, 382 F.2d 31 at 35 (5th Cir. 1967).

Cited as exemplary of the latter procedure is Duncan v. United States, 197 F. 2d 935 (5th Cir. 1952), wherein the trial judge's instruction to the jury is quoted, in part, as follows:

" 'It is, in the first instance, the duty is [sic] upon the court to say whether the circumstances of such an alleged confession or admission shall be submitted to the jury for their consideration. The court in this case is submitting to you the statements made by the defendant, the oral statement and the alleged written statement which the Government contends the defendant made at the time and place in question. However, the court is submitting such statements to you with these instructions: that unless they were freely and voluntarily made, as I have outlined to you, they would not be considered by you as evidence of guilt upon the part of the defendant. If they were not freely and voluntarily made, they would not be considered. If they were freely and voluntarily made, they would be considered by you as circumstances going to illustrate the guilt of the accused. Of course, to convict, you would have to go further and infer that such statements made by him were also true.' "
*Duncan,* supra, 197 F.2d at 938.

Such is likewise the practice in Texas. See 24 Tex.Jur.2d 290, § 678, and Vernon's Ann.Code Crim.P. Art. 38.22(b) and (c).

Recognizing then that the trial judge's admission of petitioner's confession was dispositive of neither the voluntariness nor the weight of that statement, even a superficial look at the confession reveals the probable important impact of the identification evidence on the minds of the jury. See Harrington v. California,

395 U.S. 250 at 255, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1966). For example, realizing that a confession does not have to be spontaneous to be voluntary, nevertheless, it might be wondered how the alleged rapist happened to choose such legalistic language as "My private parts penetrated her private parts." Transcript 85. Also interesting are the possible discrepancies between the confession's account and the prosecutrix' testimony of what the assailant said to her. In the statement, petitioner said that, on the day before the assault, after his wife had been gone a week, he saw

> "this girl * * * [and] decided then that * * * [he] wanted to have intercourse with her. I had only spoke to the girl one time and had never had any connection with her but had seen her in passing several times [sic]." Transcript 85.

At the trial, the complainant reported that, after the assault, the assailant

> "said he was sorry it had to be this way, that he had watched me quite some time and that he had tried to get acquainted with me and I wasn't an easy person to get acquainted with, that he wished he could have taken me out on dates, taken me to a movie and to dinner, something like that, that he was sorry it had to be this way [sic]." Statement of Facts 65.

Moreover, in referring to his departure and her calling the police, the assailant supposedly said "he couldn't get very far in five minutes", Statement of Facts 69, which could be considered inconsistent with his living in the same apartment.

None of the comments, of course, reveal irreconcilable conflicts, they are merely meant to demonstrate that the identification evidence at least provided persuasive compensation for any doubts that might have existed without it.

> "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot * * * be conceived of as harmless.

\* \* \* \* \* \*

> "Under these circumstances, it is completely impossible for us to say that the State has demonstrated beyond a reasonable doubt, that * * * [evidence of a pre-trial identification] did not contribute to * * * [petitioner's conviction]." *Chapman,* supra, 386 U.S. at 23–24, 26, 87 S.Ct. at 829.

In other words, it is not difficult to believe that, without testimony concerning the station-house identification, the jury could have found petitioner not guilty. Indeed, it is even difficult for this court to believe that there would be any reasonable doubt that the identification evidence did affect the jury's decision.

Finally, the State's assertion of waiver by the petitioner must be disposed of. The standards applicable to this issue are thoroughly discussed in Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461 (1937), Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963), and Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965). In the context of a federal habeas corpus proceeding, there is no waiver unless petitioner has intentionally abandoned a known right, understandingly foregoing the opportunity to vindicate a federal claim in state court, thereby by-passing the orderly procedures of our federal system. The repeated objections and intense cross-examination by petitioner's counsel at the trial clearly demonstrated that he opposed introduction of testimony concerning the voice identification. See Statement of Facts 26–29, 39, 91–95, 96. But of course he did not object on the basis of constitutional inadmissibility. Petitioner was tried long before the Supreme Court in *Stovall,* supra, 388 U.S. at 302, 87 S.Ct. at 1972 noted that

> "The practice of showing suspects singly to persons for the purpose of identification, and not as a part of a lineup, has been widely condemned."

and concluded that such could be a denial of

"due process of law in violation of the Fourteenth Amendment * * * independent of any right to counsel claim." *Stovall*, supra, 388 U.S. at 295, 302, 87 S.Ct. at 1972.

Moreover, the denial of petitioner's first habeas corpus application in this court, *Roper*, supra, came only six months after these decisions were issued.

"It is an understatement, of course, to say that the rights of a criminal defendant in pre-trial proceedings have expanded greatly in just the last few years. But in no area of the law was the development quicker, more startling, and perhaps more unexpected than the recent decisions regarding the right to counsel during pre-trial out-of-court identification procedures and confrontations between suspects and witnesses." *Rivers v. United States*, 400 F.2d 935 at 939 (5th Cir. 1968).

Indeed, as Judge Brown has ably pointed out, while

"Generally courts are not disposed to consider errors which have not been brought properly to their attention, but 'we may, however, carefully examine the entire record to determine whether it reveals plain errors affecting substantial rights noticeable under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A.' [citing cases]. Cautious as we are, and should be, in taking such a course, we feel that plain error of constitutional proportions was committed at this trial. Spectacular as it was, and so evident on the face of the record so that it is bound to be brought up later, we think it equally appropriate to consider it at this time. [citing case]." *Rivers*, supra, 400 F.2d at 939.

The petition for the writ of habeas corpus shall be, and it is hereby, granted; however the issuance of the writ will be stayed for a period of thirty days in order to enable the State of Texas to appeal, if it so desires.