**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**George Leo BARFIELD,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William James RYBKA,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Donny HALES,
Defendant-Appellant.**

Nos. 74–2252, 74–2487, 74–2616.

United States Court of Appeals,
Fifth Circuit.

Jan. 24, 1975.
Certiorari Denied April 28, 1975.
See 95 S.Ct. 1684.

Joseph F. McDermott, St. Petersburg, Fla., John T. Blakely, Clearwater, Fla., Oscar Blasingame, St. Petersburg, Fla. (court-appointed), for defendants-appellants.

John L. Briggs, U. S. Atty., D. Frank Winkles, Asst. U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., John Lund, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before RIVES, WISDOM and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

George Lee Barfield, William Hales, and William James Rybka, Juveniles, were found guilty of burglarizing the Barnett Bank of Auburndale, Florida. Adjudicated juvenile delinquents, they were committed to the custody of the Attorney General for the duration of their minority, 18 U.S.C. § 5031 et seq.

We note at the outset that the evidence of the guilt of these appellants was overwhelming. Nevertheless, Barfield and Rybka appeal on the ground that the District Judge, who sat without a jury, admitted into evidence statements obtained from them, they say, in violation of their Fifth Amendment privilege against self incrimination. Hales says that his Fourth Amendment rights were violated by an F.B.I. search, that he was made the victim of the testimony of an incompetent witness, and that his conviction was based upon erroneous findings of fact.

The cases were argued together and we affirm the Judgments of the District Court.

## I. THE EVIDENCE

The Bank was burglarized on November 17, 1973. A glass panel next to the back door was smashed, several teller boxes were broken open, and coins to the amount of $1184.14 were taken.

John Hales was a brother of defendant, William. On the evening of the burglary, he heard all three defendants discussing plans to break into the Bank. This conversation took place at the Hales residence, about 100 yards from the Bank. Two of the three left and walked toward the Bank. Some time later they returned to the house. Immediately a second trip was made in the direction of the Bank. The two defendants who made that trip returned with a white bag, which they placed under some

bushes. Later in the night, John Hales drove all three of the defendants to the residence of one Stephanie Brightwell. There, the coins were dumped on the floor of the living room, sorted, and counted.

Stephanie testified that all three defendants and John Hales did come to her house one night during November, 1973. She was a most reluctant witness, frequently retreating within the walls of "I don't know", but she nevertheless said that the defendants did bring "a lot of change" to her house and that they did count and sort it. Stephanie further testified, over objection, that Barfield said that the defendants should have used stockings or should have covered their faces with stockings.

Kenneth Tripp testified that Barfield lived with his family. On the day following the Barnett Bank burglary, Barfield told the Tripp brothers that he, together with Hales and Rybka, had robbed the Barnett Bank by breaking into the back door and prying open a cash deposit box. Barfield then took the Tripp brothers to a place near a railroad track, where some of the money was hidden. Barfield there displayed a lot of change in a canvas sack. This bag contained lettering, "Barnett Bank". The Tripp brothers and Barfield took the money to Dade City where they changed it into paper money. Barfield gave Jerry Tripp $100 of the money. The District Court admitted Tripp's testimony only as to the defendant Barfield.

Jerry Tripp corroborated Kenneth's testimony, again admitted only as to Barfield.

Some three or four weeks after the burglary, one Jesse Clem overheard a conversation in which Barfield participated. Something was said about the Bank and subsequently Barfield told Clem not to repeat what he had heard. This evidence was admitted as to Barfield alone.

Acting on information supplied by Barfield, F.B.I. agents obtained a search warrant and searched a small building at the Hales residence, where they found several coin wrappers, a Barnett Bank envelope, and five Canadian nickels.

Additionally, all three defendants confessed their participation in the burglary, but only the confessions of Barfield and Rybka were admitted in evidence.

## II. RYBKA'S APPEAL

As already stated, Rybka argues that the confession he gave to the F.B.I. agents was obtained in violation of his Fifth Amendment privilege against self incrimination. Rybka was 16 years old. He was questioned by F.B.I. Special Agent Gamber, who was accompanied by Special Agent Roberts. The questioning took place at the Rybka home in the presence of his mother.

Upon arrival at the Rybka residence, the agents identified themselves and handed the juvenile a form advising him of his rights, containing the customary *Miranda* warning. Rybka read a part of the warning aloud. He was then instructed to read its entire contents, whereupon he told the agents that he understood the warning but agreed to answer questions anyway. He signed the customary waiver form.

Rybka at first denied any part in the bank burglary but very quickly thereafter admitted his participation. This admission, however, was made after Agent Gamber had told Rybka that it would be in his "best interest" to tell the "real story" and that telling a lie might result in his being left "holding the bag".

Rybka testified that Agent Gamber had told him that "it will be a hell of a lot easier if you own up to it" and that if he (Rybka) did "own up to it", he might get off on probation. Rybka claimed that he had been questioned for at least 5 minutes before receiving the *Miranda* warning. The District Court credited the agent's version of the interrogation.

The issue is whether telling Rybka that (1) it would be in "his best interest"

to tell the "real story" and (2) that telling a lie might result in his being left "holding the bag" foreclosed, as a matter of law, the voluntariness of his confession.

Rybka says that he was offered an inducement to incriminate himself, that some hope of reward was held out to him and that even the slightest inducement is prohibited, citing Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

In *Bram*, Mr. Justice [later Chief Justice] White quoted with approval the following language from 3 Russell on Crime 478 (6th ed.).

"But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted." 168 U.S. at 542, 543, 18 S.Ct. at 187.

At a later point [168 U.S. at 549, 18 S.Ct. 183] the opinion stated that whether a confession is voluntary is primarily one of fact, and therefore every case must depend upon its own proof.

■ Undoubtedly, there may be circumstances when an admonition to the accused to tell the truth may render a subsequent statement inadmissible but it is now clearly the law that *ordinarily* such an admonition does not furnish sufficient inducement to render objectionable a confession thereby obtained unless *threats* or *promises* are brought into play, Martin v. United States, 4 Cir., 1948, 166 F.2d 76.

In Rivers v. United States, 5 Cir., 1968, 400 F.2d 935, a government agent was interviewing a suspect. He displayed a statute (18 U.S.C., Section 1001) dealing with the penalties for making a false statement. We held that there was no Fifth Amendment infirmity in this warning to tell the truth:

"This use of § 1001 merely emphasized that if Appellant was going to say anything, he had best tell the truth. No one made any intimation that Appellant had a duty to speak or that the statute placed such a duty upon him. Nothing in the statute was used as a coercive instrument to get Appellant to talk or confess. With *Miranda* awareness of his rights to remain silent, to have counsel, and his willingness to talk, he had no constitutional right to lie and an officer's admonition to tell the truth, whether based on morals or even misguided notions of statutory prohibitions, does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary." 400 F.2d at 943.

We think the same reasoning applies to the statement that a lie might leave Rybka "holding the bag". He had already been informed that he did not have to speak at all, either truthfully or falsely, and he was further informed that he could stop talking any time he chose.

While it is true that Rybka was only 16 years of age and the agents did not ascertain that his mother understood his constitutional rights, the District Court was nevertheless entitled to consider that the interview was conducted in the defendant's home and not at the station house, that it was done in the presence of his mother, that Rybka read the *Miranda* warning and said that he understood it, that Rybka signed a waiver form, and neither he nor his mother ever denied at any time that they understood the rights as explained by the F.B.I. agents and the *Miranda* warning.

■ Our independent review of the "totality of the circumstances" leaves us in no doubt that the findings of the District Court as to the voluntary character of Rybka's confession are strongly supported by the evidence and are not due to be disturbed on appeal.

## III. BARFIELD'S APPEAL

Barfield makes the same attack on his confession. It was obtained by Special Agent Gamber, accompanied by three other agents, pursuant to questioning at the Tripp home, where Barfield was living. Mrs. Tripp testified that Barfield was "just like" one of her own children. The interrogation was conducted in her presence. The interview began with Gamber reading the *Miranda* warning. Barfield then signed the customary waiver. Like Rybka, Barfield at first denied any knowledge of the burglary. After about 15 minutes, he admitted knowledge of the burglary but denied that he took any part in it. After about 45 minutes, Barfield did admit his participation.

As frequently the case in such incidents, the testimony concerning Barfield's confession is in sharp conflict. Barfield testified that Gamber promised that if he told the truth he would be placed on probation, that if he did not he could get 30 years. Moreover, Barfield said that Gamber told him that lying would result in his being thrown in jail that night. He claimed that at one point the agent told him that he was nothing but a "d___ liar". *Nevertheless, on cross examination, Barfield said that he told the truth because Mrs. Tripp advised him to do it.*

As in Rybka's case, Barfield was questioned at his own home, in the presence of a lady who looked upon him as if he were a son. He was read the *Miranda* warning and said he understood it. He signed the customary form, admitting that he understood his constitutional right to silence but agreeing to give it up. Moreover, Barfield had had previous experience with the police. The trial judge found him to have a "maturity beyond his years".

Barfield was only 14 years old but the individual questioned in West v. United States, 399 F.2d 467, 5 Cir. 1968, was only 15 and no parent was present at his interrogation, which was conducted at a juvenile facility.

■ As in Rybka's case, and indeed as in all such cases involving the voluntary or involuntary character of an alleged confession, including the waiver or non-waiver of constitutional rights, we must resort to a critical, but fair and impartial, analysis of the totality of the circumstances.

■ In Barfield's case that procedure produces a result no different to that reached as to his associate, Rybka.

## IV. HALES' APPEAL

The affidavit for the search warrant in this case executed by F.B.I. Special Agent Charles Long reads as follows:

I am assigned the duty of Bank Robbery Coordinator for the Tampa Division of the F.B.I. That on Thursday, December 26, 1973, Leo Barfield was interviewed by Special Agents Brooke D. Roberts and Cyril P. Gamber. That interview has been forwarded to me in my capacity as Bank Robbery Coordinator. Barfield was advised of his constitutional rights before the interview began. Barfield related that he, William Donny Hales, and William James Rybka had, on or about November 17, 1973, broken and entered the Barnett Bank of Auburndale, 300 Havendale Blvd., Auburndale, Florida. Barfield revealed that coins were stolen from the Bank and removed to said premises described above. Barfield also related that the tools used to break into the bank were also taken and placed in said premises. Barfield described the tools as a crowbar, hatchet, screwdriver, boots, stockings, and socks. Barfield related that he knows of his own personal knowl-

**58**

edge and observation that the above tools and contraband are stored in said premises.

This affidavit was dated December 27, 1973. The warrant was issued the same day by the United States District Judge.

Hales argues that while Barfield told the agents that the stolen property was on the Hales' premises on November 17, 1973, the affidavit was not made until 40 days later, thus the likelihood that the contraband could have been removed during that interval precluded a finding of probable cause to search the premises. This contention is without merit, Bastida v. Henderson, 5 Cir., 1973, 487 F.2d 860.

Neither do we see any merit to the contention that the affidavit was insufficient because it did not aver that Barfield was a reliable informant. The readily apparent answer to this is that Barfield was acting against his penal interest, he was supplying information which would enhance the chances of his own conviction of criminal participation in the burglary. This supplied its own indicia of reliability, United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). See, also, Harlow v. United States, 5 Cir., 1962, 301 F.2d 361, 372.

The attack on Brightwell's testimony, however reluctantly given, is equally unavailing. A natural reluctance to incriminate a friend does not render a witness incompetent, and her credibility is for the trier of the fact.

As indicated at the outset, if believed by the District Judge, the evidence clearly established the guilt of these Juveniles. Able counsel have energetically raised every possible barrier to the validity of the convictions, but the barriers, really, are non-existent.

The Judgment of the District Court as to each appellant is

Affirmed.