UNITED STATES, Appellee,

v.

Michael N. MURPHY, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 44,069.

NMCM 81 0555.

U.S. Court of Military Appeals.

July 23, 1984.

### Counsel

For Appellant: *Lieutenant Commander Claude P. Goddard, JAGC, USN* (argued); *Major Joseph M. Poirier, USMC* (on brief).

For Appellee: *Lieutenant Joseph J. Portuondo, JAGC, USN* (argued); *Commander W.J. Hughes, JAGC, USN* (on brief); *Lieutenant Michael P. Cogswell, JAGC, USNR.*

### Amicus Curiae

On Behalf of Appellant: *Major Richard A. Morgan* (argued); *Colonel George R. Stevens* (on brief); *Colonel Leo L. Sergi* -for Air Force Defense Appellate Division.

On Behalf of Appellee: *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Captain Thomas E. Booth, Captain Richard G. Mann, Jr., Captain Eugene R. Milhizer, Captain Michael E. Pfau, Captain Gary L. Hoffman* (on brief)-for Army Government Appellate Division.

### Opinion

COOK, Senior Judge:

Despite his pleas, a general court-martial convicted the accused of conspiracy to violate Article 1151, U.S. Navy Regulations, 1973, in violation of Article 81, Uniform Code of Military Justice, 10 U.S.C. § 881. The approved sentence extends to a bad-conduct discharge, confinement at hard labor for 1 year, forfeiture of $299.00 pay per month for 12 months, and reduction to pay grade E–1. The United States Navy-Marine Corps Court of Military Review affirmed the findings and sentence after a *sua sponte* reconsideration of an earlier decision. We granted accused's petition for review on issues challenging the voluntariness of a pretrial statement, lack of speedy trial, and the failure to give credit for alleged illegal pretrial confinement.[1] Finding no error prejudicial to the substantial rights of the accused, we affirm.[2]

This case arose in Iwakuni, Japan. On November 29, 1979, Aviation Storekeeper Third Class (AK–3) J.R. White was apprehended for possessing illicit drugs and made a statement that he had purchased

---

1. Specifically, the issues granted are:

I

WHETHER THE STATEMENTS GIVEN BY APPELLANT TO THE JAPANESE AUTHORITIES WERE INVOLUNTARY.

II

WHETHER APPELLANT WAS DENIED A SPEEDY TRIAL.

SUBISSUES

A

DOES THE OBLIGATION OF THE UNITED STATES TO RENDER ASSISTANCE TO A HOST COUNTRY UNDER A STATUS OF FORCES AGREEMENT EMPOWER AMERICAN MILITARY AUTHORITIES TO CONFINE AN AMERICAN SERVICEMEMBER? *SEE UNITED STATES v. YOUNG*, 1 M.J. 71 (C.M.A. 1975).

B

IF THE ANSWER TO (A) IS IN THE AFFIRMATIVE, BY WHAT PROCEDURE AND UNDER WHAT CRITERIA CAN DETENTION BE EFFECTED? *SEE MICHIGAN v. DORAN*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978).

C

IF DETENTION IS ALLOWABLE, FOR HOW LONG AND UNDER WHAT CIRCUMSTANCES MAY IT BE CONTINUED? *SEE UNITED STATES v. YOUNG, SUPRA.*

D

IF CONFINEMENT IS PROPERLY EFFECTED AND DURING SUCH CONFINEMENT APPROPRIATE MILITARY AUTHORITIES ACQUIRE "SUBSTANTIAL INFORMATION ON WHICH TO BASE THE PREFERENCE OF" A MILITARY CHARGE AGAINST THE CONFINEE, DOES SUCH KNOWLEDGE START THE RUNNING OF A PERIOD OF GOVERNMENT ACCOUNTABILITY TO BRING ACCUSED TO TRIAL ON THE MILITARY OFFENSE UNDER *UNITED STATES v. BURTON*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971)? *SEE UNITED STATES v. JOHNSON*, 23 U.S.C.M.A. 91, 93, 48 C.M.R. 599, 601 (1974).

III

WHETHER APPELLANT SHOULD RECEIVE CREDIT FOR ILLEGAL PRETRIAL CONFINEMENT.

For reasons to be stated in the text, we hold that all of the specified issues should be resolved adversely to appellant.

2. Counsel at trial and the military judge are commended for their fine work in developing and litigating the various issues in this case. It need hardly be said that proper exploration and resolution of issues at trial greatly assist the appellate authorities.

the drugs from the accused on the previous day. The Government of Japan was notified on November 30 of White's apprehension and his statement implicating the accused, and, as was the customary practice, assumed jurisdiction over the drug offenses.[3] Naval Investigative Service (NIS) agents apprehended the accused and turned him over to the Japanese police. At that time, he made no statement, but he did provide a urine specimen to the Japanese police.

On or about January 8, 1980, Captain Wayne Samuelson, the resident trial counsel at Marine Corps Air Station, Iwakuni, Japan, advised the accused of rights accruing to service personnel under the terms of the Status of Forces Agreement with Japan (SOFA). Captain Samuelson specifically informed the accused that he could not enter into an attorney-client relationship with him and that he was not desirous of eliciting information regarding the acts under investigation. In addition to a form stating specific rights, Captain Samuelson routinely gave the following advice in these circumstances:

> I inform them that during the stages of the investigation they will probably be contacted and requested to make a statement by the police out there and also by the procurator, or the chances that it will be made by the procurator. I also explain that under our system a person has an absolute right to remain silent and that nothing adverse can be taken from his right to remain silent under our system. I advise them that the Japanese system differs a little bit, in that should the case go to court and should the individual be convicted, the judge takes into consideration whether the individual has cooperated with the various investigating

agencies and whether he has told the truth to those agencies.

\*     \*     \*     \*     \*     \*

> [A]nd I typically tell the individuals that if the Japanese prosecute the case the Americans will not.

On January 15, 1980, the accused left Japan and returned to the United States without authorized leave. He then returned voluntarily to military control on January 29, 1980. Upon his return to Iwakuni on February 7, 1980, he was confined there by order of the base executive officer at the request of the Japanese procurator. On February 9, 1980, he was again questioned by the Japanese police and, at that time, made an inculpatory statement. The Japanese police interpreter testified that the accused was advised of his rights prior to the interrogation, which advice included a statement that he did "not have to say anything against . . . [his] free will." The interpreter also testified that he may have told the accused "that if he did not confess and cooperate with . . . [the interpreter] a Japanese judge would hold it against him and he would be treated more harshly by the court; but if he confessed and cooperated, the judge would be lenient with him and give him a light sentence."

The accused, testifying on the limited issue of the voluntariness of his statement, related that he understood Captain Samuelson to have advised him "that the judge in a Japanese court would look favorably if . . . [he] gave a statement and cooperated with the police," but that if he did not, "it would reflect in . . . [his] sentence." He also remembered being "told that if the Japanese took jurisdiction, then the military wouldn't have jurisdiction, and if the Japanese gave up their jurisdiction, then the military could take the case if they had any evidence." He then "asked . . . [Cap-

---

**3.** The AGREEMENT UNDER ARTICLE VI OF THE TREATY OF MUTUAL COOPERATION AND SECURITY BETWEEN THE UNITED STATES OF AMERICA AND JAPAN, REGARDING FACILITIES AND AREAS AND THE STATUS OF UNITED STATES ARMED FORCES IN JAPAN, Jan. 19, 1960, Senate Executive E, 86th Cong., 2nd Sess. 81 (1960), 11 U.S.T. 1652, 1664,

T.I.A.S. No. 4510, Article XVII, paragraph 1(b), provides:

> (b) the authorities of Japan shall have jurisdiction over the members of the United States armed forces . . . with respect to offenses committed within the territory of Japan and punishable by the law of Japan.

tain Samuelson] ... if the Japanese did take jurisdiction would the military prosecute.... [Captain Samuelson] told ... [him] that they would not."[4] The issue of voluntariness was properly litigated[5] before both the military judge and the court members, and the court members were given proper instructions to aid their independent resolution of this issue.

On February 28, 1980, the accused was indicted by Japanese authorities for violating the drug laws of Japan. On March 3, 1980, charges of conspiracy in violation of Article 81 were preferred against the accused by United States authorities. Japanese court hearings began on May 2 and concluded on June 13, 1980. The accused received a suspended sentence.

Upon his own request, and with the permission of the Japanese procurator, the accused was released from confinement on May 9, 1980, and placed on base restriction. After the Japanese court sentence was published on June 13, the restriction was lifted. The Article 32, UCMJ, 10 U.S.C. § 832, investigation commenced on May 16, 1980, at which time the accused made a demand for speedy trial.[6] The charge was referred to trial on July 12; on July 14, accused made a second demand for speedy trial. The trial started on August 5, 1980. The accused was in pretrial confinement for a total of 92 days and he was restricted for an additional 35 days.

## I. *Voluntariness of the statement.*

■ Since it was anticipated that the Japanese authorities would exercise their right of primary jurisdiction over the drug offense, United States authorities did not participate in the interrogation of the accused or in further investigation of the offense. The advisement of rights given to the accused by the Japanese interpreter was in accordance with agreements between the United States and Japan. *See* Agreed Minutes To The Agreement Under Article VI Of The Treaty Of Mutual Cooperation And Security Between The United States Of America And Japan, Regarding Facilities And Areas And The Status Of United States Armed Forces In Japan (hereinafter referred to as THE MINUTES), Jan. 19, 1960, Re Article XVII, paragraph 9, 11 U.S.T. 1749, 1753–54, T.I. A.S. No. 4510. This advisement of rights did not satisfy the requirements of Article 31, UCMJ, 10 U.S.C. § 831, but that, by itself, does not prevent admission of the statement, since "[a]n independent investigation by a foreign police officer is ... not subject to the Uniform Code." *United States v. Swift*, 17 U.S.C.M.A. 227, 231, 38 C.M.R. 25, 29 (1967), *citing United States v. Grisham*, 4 U.S.C.M.A. 694, 16 C.M.R. 268 (1954). Hence, there was no requirement that the accused be advised of his rights under Article 31. As we observed in *United States v. Jones*, 6 M.J. 226, 228 (C.M.A. 1979):

> [W]e perceive practical difficulties in implementing such a rule where a foreign interrogation is involved. Initially, we note that such advice may be inconsistent with the law of the foreign country involved. Furthermore, government counsel has asserted in the present case ... that the law of the Federal Republic of Germany would permit adverse comment upon the silence of an accused. Thus, an accused can actually be harmed if he is tried by a foreign court and attempts to assert his rights consistently with American law.

■ However, we must still determine whether the statement was voluntarily made. A review of the evidence concerning the approximately 2-hour interrogation by the Japanese police discloses no overt coerciveness affecting the voluntariness of the confession. *Cf. United States v.*

4. It is clear that, essentially, the advice was understood as given and no misunderstanding of decisional significance occurred.

5. The Court of Military Review found that the statements of the Japanese interpreter did not

constitute sufficient inducement to render the statement involuntary.

6. Apparently there was no response to this request. The Government did answer the second demand for trial.

*O'Such*, 16 U.S.C.M.A. 537, 37 C.M.R. 157 (1967).

We are left with the additional matter of Captain Samuelson's further advice to the accused that if the accused were tried by the Japanese court, there would be no further trial by court-martial. This advice, though undoubtedly correct in most instances, could well have been understood by the accused to indicate that if he made a statement to the Japanese police, it would not be used against him by United States authorities. If the accused's testimony is to be believed, this was "one of the motivating forces" that caused him to make the statement. It is apparent from the sentence imposed by the Japanese court that the accused benefited by "cooperating" with the Japanese police. Thus, we must decide whether advice that was correct when given and resulted in a benefit to the accused constitutes an "unlawful inducement" when viewed in the light of later happenings and/or changed circumstances. *See* Article 31(d), 10 U.S.C. § 831(d).

It is argued that the case of *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), requires an affirmative resolution of this question. Bram was tried for, and convicted of, the murder of the captain of the American ship, HERBERT FULLER, his wife, and the second mate, while on the high seas. The crew of the HERBERT FULLER initially confined a Seaman Brown for the offense, but, in consequence of a statement made by

Brown to the effect that he "saw Bram ... kill the captain," *id.* at 536, 18 S.Ct. at 184, they also confined Bram. The ship was "steered" for Halifax, Nova Scotia, and both Brown and Bram were confined by the Canadian authorities at the request of the Consul General of the United States. Prior to being brought before the Consul, Bram was taken from prison to the office of a detective where he was stripped [7] and searched. During that time, the detective told " 'Bram ... [that he was] trying to unravel this horrible mystery,' " and that " 'Brown ... [had] made a statement that he saw ... [Bram] do the murder.' " Bram responded: " 'He could not have seen me; where was he?' " The detective answered: " 'He states he was at the wheel.' " Bram then replied: " 'Well, ... he could not see me from there.' " Bram concluded by remarking: " 'Well, I think, and many others on board the ship think, that Brown ... [was] the murderer; but I don't know anything about it.' " *Id.* at 539, 18 S.Ct. at 185. This conversation was admitted at trial over objection as a confession by Bram.[8]

After reviewing the historical precedents in both Great Britain and the United States, and the scope of the fifth amendment, the Supreme Court concluded that the conversation should not have been admitted on the ground that it was involuntarily made. Mr. Justice White stated:

It cannot be doubted that, placed in the position in which the accused was when

---

7. This fact was mentioned several times in the majority opinion, apparently as an aspect of coerciveness. *See* 168 U.S. 532, 538, 539, 561 (in italics), 563, 18 S.Ct. 183, 185, 185, 194, 194 (1897).

8. A matter of trial procedure has a bearing on the rationale of the *Bram* decision. Bram's statement is equivocal in nature. It was introduced by the Government as a confession, and the defense contended that it was involuntarily made. However, on appeal the Government argued that its admission was not prejudicial since it did not tend to prove guilt. This "Catch-22" argument was rejected by the majority:

  It is manifest that the sole ground upon which the proof of the conversation was tendered was that it was a confession, as this was the

only conceivable hypothesis upon which it could have been legally admitted to the jury. It is also clear that in determining whether the proper foundation was laid for its admission, we are not concerned with how far the confession tended to prove guilt. ... If found to have been illegally admitted, reversible error will result, since the prosecution cannot on the one hand offer evidence to prove guilt, and which by the very offer is vouched for as tending to that end, and on the other hand for the purpose of avoiding the consequences of the error, caused by its wrongful admission, be heard to assert that the matter offered as a confession was not prejudicial because it did not tend to prove guilt.

168 U.S. at 541, 18 S.Ct. at 186.

the statement was made to him that the other suspected person had charged him with crime, the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying there was hope of removing the suspicion from himself. ... To communicate to a person suspected of the commission of crime the fact that his co-suspect has stated that he has seen him commit the offence, to make this statement to him under circumstances which call imperatively for an admission or denial and to accompany the communication with conduct which necessarily perturbs the mind and engenders confusion of thought, and then to use the denial made by the person so situated as a confession, because of the form in which the denial is made, is not only to compel the reply but to produce the confusion of words supposed to be found in it, and then use statements thus brought into being for the conviction of the accused. A plainer violation ... of the letter as of the spirit and purpose of the constitutional immunity could scarcely be conceived of.

*Id.* at 562, 564, 18 S.Ct. at 194, 195.

The decision in *Bram* appears to be premised on the fact that the Canadian detective was acting for United States authorities since no Canadian law had been violated. Hence, the conditions surrounding the questioning were interpreted in accordance with United States constitutional principles. It should be noted that there was no advisement of rights even under Canadian law, and that the accused had not yet been taken before the United States Consul for whom he was being held. Consequently, the conditions surrounding the questioning take on an odious character. However, there is dicta in *Bram*, which, if taken literally, would bar almost any statement given to official authorities. The majority opinion quotes with approval this state-

ment from 3 Russell on Crimes 478 (6th ed.):

"But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.... A confession can never be received in evidence where the prisoner has been influenced by any *threat or promise*; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any *degree of influence* has been exerted."

168 U.S. at 542–43, 18 S.Ct. at 187 (emphasis added).

However correct the latter part of the quotation may have been at the time, it is clear that it no longer correctly states the law. In *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir. 1967), it was held:

That language has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined * * *." *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 ... (1961); ...

In *United States v. Rybka*, 507 F.2d 53 (5th Cir.), *cert. denied* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), the juvenile defendant, after having been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was told by an FBI agent "that it would be in his 'best interest' to tell the" truth "and that telling a lie might result in his being left 'holding the bag.' " 507 F.2d at 55. At trial, Rybka asserted "that he was offered an inducement to incriminate himself, ... and that even the slightest

inducement" was "prohibited" by *Bram v. United States, supra.* The Court of Appeals disposed of his assertion in this manner:

> Undoubtedly, there may be circumstances when an admonition to the accused to tell the truth may render a subsequent statement inadmissible but it is now clearly the law that *ordinarily* such an admonition does not furnish sufficient inducement to render objectionable a confession thereby obtained unless *threats or promises* are brought into play. [Citation omitted.]

> \* \* \* \* \* \*

> Our independent review of the "totality of the circumstances" leaves us in no doubt that the findings of the District Court as to the voluntary character of Rybka's confession are strongly supported by the evidence and are not due to be disturbed on appeal.

507 F.2d at 56–57.

In *United States v. Ballard*, 586 F.2d 1060 (5th Cir. 1978), the accused testified that she was told by the detaining officer "that he would see to it that she got fifteen years for each of three offenses and that, if she cooperated, her chances for probation were excellent." *Id.* at 1062. The agent disputed this version, but there were areas where there was no factual dispute: the agent informed the accused that her sister had made a full confession; that in return for her cooperation the Government would make a recommendation for clemency; and what the maximum penalty was and what she might reasonably expect to receive. The Court of Appeals found none of these circumstances sufficient to disturb the lower court's ruling admitting the accused's statement.

> A truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved rather than a

coercive atmosphere, the statement may be considered to have been voluntarily made. ...

> Determining whether a confession is voluntary requires an assessment of human motivation and behavior. One factor, by itself, is seldom determinative. Consequently, the impact of any one of the aforementioned acts will vary according to the circumstances under which they were performed and the state of mind of the accused.

*Id.* at 1063.

We thus conclude that most recent interpretations of *Bram* have emphasized another part of that decision:

> [W]hether a confession was voluntary was primarily one of fact, and therefore every case must depend upon its own proof.

168 U.S. at 549, 18 S.Ct. at 189. Accordingly, we must look to the facts surrounding the giving of the inducement and assess its effect upon the likelihood of its "overbearing ... [his] free will." *United States v. Ballard, supra.*

The circumstances surrounding the advice given by Captain Samuelson certainly imply no atmosphere of coerciveness since it was made clear that Captain Samuelson was in no way acting as the accused's attorney and his advice was a standard one, given to all personnel accused of violating Japanese law. However, we must consider that advice in combination with the similar advice given by the Japanese interpreter at the police station. As we have noted above, there were no aspects of overt coerciveness during the police interrogation. Nonetheless, the prospect of more lenient treatment resulting from "cooperation" with the police undoubtedly had a bearing on the accused's decision to make an incriminating statement. On the other hand, we find nothing to indicate that this inducement, even if read in conjunction with the countervailing advice that failure to give a statement would result in a harsher sentence, would lead to the conclusion that the accused's freedom of will was in any way *legally* impaired. We believe the situation

was more akin to placing the accused in the position of making a tactical judgment as to his making a statement. The advice provided the accused with "an informed and intelligent appraisal of the risks involved," *United States v. Ballard, supra,* which bore upon his decision. We might speculate that in such circumstances the accused might well have made the statement in order to forestall a more severe sentence from the Japanese court even knowing that it might be used against him later by military authorities. In retrospect, such a choice was correct. Such analysis, however, then raises the prospect that the statement to gain leniency from the foreign court might be false in content since the truth of the statement in that court would not be as important as the fact of the making of the statement. Our examination of the other evidence in the case, particularly the testimony of the witnesses against the accused, leads us to conclude that the statement is amply corroborated.

In sum, we hold that the advice given to the accused, though it may have prompted him to make the statement, did not overbear his free will in making that choice; that there was no illegal or unlawful inducement in the advice; and, accordingly, that the statement was voluntarily made. Thus, there was no error in the admission of the statement into evidence. *See United States v. Jones, supra.*

II. *Authority to confine at the request of a foreign government.*

The authority of a United States military commander to confine a United States serviceperson to ensure his or her presence at a foreign trial has not been previously addressed by this Court. We need not explore a commander's inherent authority to confine in certain situations,[9] which exists independently of the Uniform Code,[10] since here the accused was confined by United States authorities at the specific request of the Japanese government, after he had returned to Japan from an unauthorized absence in the United States.

■ Certain basic principles of international law are pertinent to this issue. It is an accepted principle of international law that "[a] sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." *Wilson v. Girard,* 354 U.S. 524, 529, 77 S.Ct. 1409, 1412, 1 L.Ed. 1544 (1957), *citing The Schooner-Exchange v. M'Faddon,* 7 Cranch (11 U.S.) 116, 136, 3 L.Ed. 287 (1812). The stationing of United States forces overseas other than during periods of war prompted a series of international agreements concerning the rights and privileges of the government and the citizens of the United States and the several host governments and their citizens. The specific agreement involved here is an Executive Agreement which was negotiated pursuant to Article VI of *The Treaty of Mutual Cooperation and Security Between the United States of America and Japan* (hereinafter referred to as THE TREATY), Jan. 19, 1960, 11 U.S.T. 1632, T.I.A.S. No. 4509, entitled, AGREEMENT UNDER ARTICLE VI OF THE TREATY OF MUTUAL COOPERATION AND SECURITY BETWEEN THE UNITED STATES OF AMERICA AND JAPAN, REGARDING FACILITIES AND AREAS AND THE STATUS OF UNITED STATES ARMED FORCES IN JAPAN (hereinafter referred to as THE AGREEMENT), Jan. 19, 1960, 11 U.S.T. 1652, T.I.A.S. No. 4510.

Article VI of THE TREATY states:

For the purpose of contributing to the security of Japan and the maintenance of international peace and security in the Far East, the United States of America is

---

9. The power to order a serviceperson to hazard his life must necessarily include the power to order certain restrictions on his liberty.

10. One example would be a situation in which an accused commits an atrocity that violates the laws of war, such as killing civilians without cause, yet his act is one that is not specifically recognized by the Uniform Code of Military Justice.

granted the use by its land, air and naval forces of facilities and areas in Japan.

The use of these facilities and areas as well as the status of United States armed forces in Japan shall be governed by a separate agreement, replacing the Administrative Agreement under Article III of the Security Treaty between the United States of America and Japan, signed at Tokyo on February 28, 1952, as amended, and by such other arrangements as may be agreed upon.

Senate Executive E, 86th Cong., 2d Sess. 65 (1960) (footnotes omitted); *see also* 11 U.S.T. 1634.

In a letter of transmittal dated March 10, 1960, President Eisenhower forwarded THE AGREEMENT to the Senate, stating:

*To the Senate of the United States*:

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, signed at Washington on January 19, 1960.

I transmit also, for the *information* of the Senate, one copy each of the following documents: Agreed minutes and three exchanges of notes relating to the treaty; Agreement Under Article VI of the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Regarding Facilities and Areas and the Status of United States Armed Forces in Japan; and agreed minutes and an exchange of notes relating to the agreement. All of the above-mentioned documents were signed or, in the case of the minutes, initialed at Washington on January 19, 1960.

The treaty constitutes the foundation for cooperation, a partnership with Japan, based on mutual confidence and sovereign equality, not only in the security field but in the political and economic fields. It reflects the broad area of mutual interest between the United States and Japan. The treaty is entirely defensive in character and intent and represents a threat to no country or people.

It is in full conformity with the purposes and principles of the United Nations and reflects the dedication of both parties to strengthen the efforts of the United Nations to maintain international peace and security.

A fuller explanation of the treaty, agreement, and related documents is contained in the report of the Secretary of State, which is transmitted herewith for the information of the Senate.

DWIGHT D. EISENHOWER

Senate Executive E, 86th Cong., 2d Sess. 59 (1960)(emphasis added); (also appears at 106 Cong. Rec. 5129 in modified form).

Article XVII, paragraph 5, of THE AGREEMENT provides:

5. (*a*) The military authorities of the United States and the authorities of Japan shall assist each other in the arrest of members of the United States armed forces, the civilian component, or their dependents in the territory of Japan and in handing them over to the authority which is to exercise jurisdiction in accordance with the above provisions.

(*b*) The authorities of Japan shall notify promptly the military authorities of the United States of the arrest of any member of the United States armed forces, the civilian component, or a dependent.

(*c*) The custody of an accused member of the United States armed forces or the civilian component over whom Japan is to exercise jurisdiction shall, if he is in the hands of the United States, remain with the United States until he is charged by Japan.

Senate Executive E, 86th Cong., 2d Sess. 81 (1960); *see also* 11 U.S.T. 1665.

THE MINUTES, concerning paragraph 5 of Article XVII of THE AGREEMENT, state:

1. In case the Japanese authorities have arrested an offender who is a member of the United States armed forces, the civilian component, or a dependent subject to the military law of the United States with respect to a case over which Japan has the primary right to exercise

jurisdiction, the Japanese authorities will, unless they deem that there is adequate cause and necessity to retain such offender, release him to the custody of the United States military authorities provided that he shall, on request, be made available to the Japanese authorities, if such be the condition of his release. The United States authorities shall, on request, transfer his custody to the Japanese authorities at the time he is indicted by the latter.

2. The United States military authorities shall promptly notify the Japanese authorities of the arrest of any member of the United States armed forces, the civilian component or a dependent in any case in which Japan has the primary right to exercise jurisdiction.

Senate Executive E, 86th Cong., 2d Sess. 94 (1960); *see also* 11 U.S.T. 1753.

While there is still some dispute over the relative supremacy of Executive agreements as contrasted to treaties,[11] and whether or not specific international agreements are deemed to be self-executing, the question of the binding nature of the obligations of the Japanese SOFA and its implementing interpretations was resolved by

*Wilson v. Girard, supra.* There the Supreme Court said:

In the light of the Senate's ratification of the Security Treaty after consideration of the Administrative Agreement, which had already been signed, and its subsequent ratification of the NATO Agreement, with knowledge of the commitment to Japan under the Administrative Agreement, we are satisfied that the approval of Article III of the Security Treaty authorized the making of the Administrative Agreement and the subsequent Protocol embodying the NATO Agreement provisions governing jurisdiction to try criminal offenses.

354 U.S. at 528–29, 77 S.Ct. at 1411.

The AGREEMENT gives the United States custody over a member of its forces accused of a violation of Japanese law "until he is charged by Japan." Art. XVII, para. 5(c). The MINUTES quoted above further define this right by giving the Japanese authorities the right to retain custody if "they deem that there is adequate cause and necessity," but in all other cases custody will be given to United States authorities, subject to the serviceperson's being made available upon request, until the time of indictment by the Japanese. It

---

**11.** U.S. CONST. art. VI, para. 2, provides, in pertinent part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land.

In interpreting this clause, the Supreme Court held:

The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent.

*Geofroy v. Riggs*, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1890).

Since the Japanese Agreement was concluded under the terms of *The Treaty of Mutual Cooperation and Security Between the United States of America and Japan*, Jan. 19, 1960, 11 U.S.T.

1632, T.I.A.S. No. 4509, and since it was specifically submitted to the Senate for information as part of the ratification package, it must be considered differently from the typical Executive Agreement. *See* Heath, *Status of Forces Agreements As A Basis for United States Custody Of An Accused* [hereinafter cited as Heath], 49 Mil. L.Rev. 45, 80 (1970). It is noted that the full text of the AGREEMENT UNDER ARTICLE VI OF THE TREATY OF MUTUAL COOPERATION AND SECURITY BETWEEN THE UNITED STATES OF AMERICA AND JAPAN, REGARDING FACILITIES AND AREAS AND THE STATUS OF UNITED STATES ARMED FORCES IN JAPAN, Jan. 19, 1960, 11 U.S.T. 1652, T.I.A.S. No. 4510, and Agreed Minutes To The Agreement Under Article VI Of The Treaty Of Mutual Cooperation And Security Between The United States Of America And Japan, Regarding Facilities And Areas And The Status Of United States Armed Forces In Japan, Jan. 19, 1960, 11 U.S.T. 1749, T.I.A.S. No. 4510, were read into the Congressional Record. 106 Cong. Rec. 13537–43. The matter seems to have been resolved by *Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed. 1544 (1957).

would appear that custody may remain with the United States beyond the time of indictment even to the time of sentencing, or, possibly even completion of appeal. In this case custody remained with the United States until time of sentencing.

The word "custody" is not defined in either the AGREEMENT or the MINUTES, and we do not have the benefit of any pertinent negotiating history which might have some bearing on the intentions of the parties. Absent that, we must define the term "custody" in accordance with the commonly accepted usage in this country.[12] *Black's Law Dictionary* 347 (5th ed. 1979), defines custody as:

The care and control of a thing or person. The keeping, guarding, care, watch, inspection, preservation or security of a thing, carrying with it the idea of the thing being within the immediate personal care and control of the person to whose custody it is subjected. Immediate charge and control, and not the final, absolute control of ownership, implying responsibility for the protection and preservation of the thing in custody. Also the detainer of a man's person by virtue of lawful process or authority.

The term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession. Term "custody" within statute requiring that petitioner be "in custody" to be entitled to federal habeas corpus relief does not necessarily mean actual physical detention in jail or prison but rather is synonymous with restraint of liberty. [Citation omitted.] Accordingly, persons on probation or released on own recognizance have been held to be "in custody" for purposes of habeas corpus proceedings.

Thus "custody" is susceptible of being interpreted to include the spectrum from confinement to any lesser form of control over the person of the accused.[13]

It would appear that the quantum of restraint must be determined by the officer having command control of the accused on the basis of his decision as to his ability to comply with the requirement to "make the accused available" upon request to the Japanese authorities and to transfer the accused to the custody of the Japanese authority after indictment. In reaching that decision, the commander must consider the likelihood of the accused's fleeing his control and the consequent embarrassment to the United States at being unable to transfer the accused upon request of the host government. *Cf.* para. 18, Manual for Courts-Martial, United States, 1969 (Revised edition). There are a number of value judgments which impact upon that largely discretionary decision. If the likelihood of flight is miniscule, then the level of restraint need only be nominal; if the likelihood of flight is great, much more restraint

---

**12.** "Custody" of a military person is not easily defined.

In the case of a man in the military or naval service, where he is, whether as an officer or a private, always more or less subject in his movements, by the very necessity of military rule and subordination, to the orders of his superior officer, it should be made clear that some unusual restraint upon his liberty of personal movement exists to justify the issue of the writ; otherwise every order of the superior officer directing the movements of his subordinate, which necessarily to some extent curtails his freedom of will, may be held to be a restraint of his liberty, and the party so ordered may seek relief from obedience by means of a writ of *habeas corpus.*

Something more than moral restraint is necessary to make a case for *habeas corpus.*

.

*There must be actual confinement or the present means of enforcing it.*
*Wales v. Whitney,* 114 U.S. 564, 571–72, 5 S.Ct. 1050, 1053, 29 L.Ed. 277 (1885) (emphasis added).

**13.** The Uniform Code of Military Justice makes a distinction between "confinement" and "custody," at least for the purpose of defining a violation of Article 95, UCMJ, 10 U.S.C. § 895. The Manual for Courts-Martial, United States, 1969 (Revised edition), defines "custody" as "restraint of free locomotion imposed by lawful apprehension" and "confinement" as "the physical restraint of a person." Paras. 174*d* and 18. However, this somewhat blurred distinction is further obscured by the fact that the punishment for escape from either confinement or custody is the same. Hence, we do not find these definitions helpful here.

would be necessary. Other considerations include the freedom of movement within the foreign country, the ease of leaving the country, the current state of the trial proceedings, the likelihood of conviction, as well as the relative severity and likelihood of sentence. These and other factors would have direct bearing on the quantum of restraint necessary in a given case.

We also note that the several services differ in the power accorded commanders to confine at the request of a foreign government. The Air Force does not acknowledge any such power and Air Force commanders will not accept custody of an individual accused of a crime in a foreign country if the foreign government requires that he be confined or if the local commander determines that pretrial confinement is necessary to insure his presence for the foreign trial unless there is an independent basis for pretrial confinement under the Uniform Code. *See* AFR 110–25, para. 3 (April 23, 1973). Both the Army and the Navy take the position that the custody requirements of the various SOFAs provide authority for restraint, including confinement of servicepersons, pending disposition of foreign charges. *See* AR 27–10, ch. 17; COMNAVFORJAPANINST 5820.16A, para. 406a(3) (May 10, 1976). It is the latter regulation with which we are dealing here. Paragraphs 0405 and 0406 thereof both recognize the importance of the obligation of the United States to produce the accused for investigations and trial and to avoid embarrassment to the United States where a suspect was allowed to leave Japan prior to final disposition of his case.[14]

Several federal courts have upheld the authority of military commanders, under the provisions of a SOFA-type agreement, to retain custody of an accused charged by a foreign government with a violation of its laws. In *Williams v. Rogers*, 449 F.2d 513 (8th Cir. 1971), *cert. denied*, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972), the accused was charged by the Philippine government and custody was returned to the United States Air Force in accordance with the Military Bases in the Philippines Agreement, T.I.A.S. No. 1775, as amended by T.I.A.S. No. 5851. Through administrative error, the accused was reassigned from the Philippines. When Air Force authorities attempted to reassign him to the Philippines, the accused sought to block the transfer in federal court. In sustaining a lower court order dissolving a temporary restraining order, the United States Court of Appeals held:

[W]e think that once the President is properly found to possess the power to negotiate jurisdictional arrangements of the sort present here, it is not impermissible also to find that he has the correlative power to enforce the obligations of our servicemen undertaken pursuant thereto. We emphasize, also: (a) The obvious interest of the military in securing the custody of those of its personnel who are charged with the commission of crimes by Philippine authorities pending their trial; (b) The impact and adverse effect that an open and well-publicized breach of the solemn obligations imposed on commanding officers by the custodial provisions of Article XIII has upon the reputation and integrity of American Servicemen stationed in the Philippines and upon the military mission and purposes of our bases there; (c) Our conviction that custodial provisions of the kind involved here can have present and future meaning and significance only if Armed Forces supervisory personnel are deemed to possess the power to correct administrative errors of the kind that occurred here; (d) Our feeling that the benefit to Sergeant Williams in being permitted to remain on base and in American custody pending the final disposition of the Philippine proceedings against him produced a concomitant obligation to report and appear when required to do so and to remain responsive to the curative orders

---

**14.** Certain embarrassments occasioned by the flight of an accused in "custody" but not in confinement are related *infra.*

of superior officers if, as here, a mistake should occur through inadvertence and oversight.

*Id.* at 521–22.

In *United States ex rel. Stone v. Robinson*, 309 F.Supp. 1261 (W.D. Pa.), *aff'd.*, 431 F.2d 548 (3d Cir. 1970), Stone had been convicted of robbery and attempted rape by a Japanese court. Pending final appeal, Stone was returned to United States Air Force authorities by the Japanese, with a formal request that he be retained in custody for the purpose of trial. Stone subsequently left Japan of his own volition. The court concluded:

Since the United States Government had an obligation to retain custody of the petitioner pursuant to the SOFA with the Government of Japan, and the petitioner had an obligation to make himself available when wanted by the Government of Japan, neither the Government of the United States could breach its obligation to Japan, nor could the petitioner after the appellate proceedings became final, suddenly leave the jurisdiction of Japan. When he did leave the jurisdiction of Japan, it was incumbent upon the United States Government to arrest and seize him, wherever it could find him, and return him. I therefore conclude and hold that the arrest by the Armed Forces of the petitioner as of the time when he was arrested was a valid arrest and that the Government of the United States is entitled to his custody for the purpose of returning him to the jurisdiction where it was bound to hold him in custody.

*Id.* at 1268–69 (footnote omitted).

In *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972), three servicemen fled West Germany while pending trial in German courts. They surrendered to Army officials in the United States and brought habeas corpus action to prevent being returned to West Germany for trial. The court held:

Obviously, the constitutional provisions appellants invoke exerted no force of their own upon the Federal Republic in that exercise of its sovereignty. And while, of course, American officials having custody of appellants are fully subject to constitutional commands, it must be remembered that the contemplated surrender is the precise response required of the United States by its treaty commitments to the Federal Republic. The Constitution plays no part in this case unless somehow it operates to negate those commitments in the circumstances appellants allege.

*Id.* at 1218 (footnote omitted).

In *Cozart v. Wilson*, 236 F.2d 732 (D.C. Cir. 1956), *vacated with direction to dismiss the petition for habeas corpus as moot*, 352 U.S. 884, 77 S.Ct. 126, 1 L.Ed.2d 82 (1956), the petitioners had been convicted of numerous offenses by Japanese courts and complained that they were being kept in the Marine Corps and in Japan after their enlistments had expired. The court upheld dismissal of the petition, stating:

Since Japan has not, either at the time of the offenses with which the present petitioners are charged or at any later time, ceded to the United States jurisdiction of these offenses, Japan has jurisdiction to try the petitioners and might hold them in jail pending trial. They do not and cannot complain because they are not so strictly confined.

*Id.* at 733.

In *Smallwood v. Clifford*, 286 F.Supp. 97 (D.C. 1968), *judgment vacated as moot*, No. 22,053 (D.C. Cir. May 14, 1969), the accused was placed in pretrial confinement by the Army "after having been implicated in the murder of a female Korean national." *Id.* at 98. The Korean government gave notice of its intention to exercise its primary right of jurisdiction. In addition, Smallwood was subsequently charged under the Uniform Code. Smallwood contended that neither the Code nor the Manual for Courts-Martial, United States, 1951, gave authority for delivery of American servicepersons to foreign governments for trial and that his "fourteenth" [sic] amendment right to due process would be violated

if he were tried by a Korean court. The court disposed of Smallwood's arguments thusly:

It should be stated at the outset that under the applicable principles of international law, Korea should have exclusive jurisdiction to punish offenses committed within its territory, unless it expressly or impliedly consents to surrender its jurisdiction. Thus, the Status of Forces Agreement embodied the consent of the Korean government to a diminished role in the enforcing of its territorial laws. The United States did not waive any jurisdiction over crimes committed within *its* territory. The Agreement constituted a unilateral waiver by Korea of criminal jurisdiction in certain limited cases. Where a crime falls outside the area covered by this limited waiver, primary jurisdiction is maintained by the nation within which the crime occurred. Ratification of this principle by the United States Senate is clearly unnecessary, since Senate approval could have no effect on a grant of jurisdiction by the Republic of Korea, which the United States could not rightfully claim.

*Id.* at 100 (footnotes omitted).

Petitioner states that both the Constitution and the Uniform Code of Military Justice provide the method of trying servicemen abroad and that this method cannot be altered by an Executive Agreement. This contention has merit only in instances in which there has been no violation of the criminal code of a foreign state. However, when the offense is against the laws of another nation, primary jurisdiction lies with that nation, and only when it expressly or impliedly

waives its jurisdiction will the provisions of the Uniform Code of Military Justice apply. The *Girard* case holds that the primary right of jurisdiction belongs to the nation in whose territory the serviceman commits the crime.

*Id.* at 101 (footnote omitted).

To argue that under the applicable rule of international law, visiting forces retain jurisdiction is to close one's eyes to the historical fact that this matter is no longer left up to the implications of law but is carefully expressed in agreements which are explicit qualifications of consent to station visiting forces.

*Id.* at 101–02.

Our consideration of these diverse authorities leads to the following conclusions:

1. The power of the commander to confine a serviceperson at the request of a foreign government for the purpose of the exercise of foreign criminal jurisdiction is included within the definition of "custody" which comes from the treaties in force and exists independently of the Uniform Code of Military Justice.[15]

2. There is discretion to select that form of custody which will suffice to guarantee the appearance of the criminal accused as requested by the foreign government. A corollary to this is that the least form of restriction of locomotion necessary to ensure appearance should normally be selected.

Applying these conclusions to the instant case, we hold that the procedures followed here pass the constitutional test. The accused was confined at the request of

---

**15.** *See* Heath, *supra*; Coleman, *Custody Provisions of Status of Forces Agreements As Authority To Confine U.S. Military Personnel Abroad*, 17 Mil.L. and L. of War Rev. 441 (1978). It is clear that in the alternative, as apparently is the Air Force practice, failure to ensure custody of an accused by other than American confinement would result in turning the accused over for foreign confinement, a practice in conflict with United States policy. *See* S. Lazareff, *Status of Military Forces Under Current International Law* 240–42 (A.W. Sijthoff/Leyden 1971); *cf.* Senate Resolution of July 15, 1953, 99 Cong. Rec. 8780,

*reprinted at* 4 U.S.T. 1828–29. Thus, it is evident that in cases where the accused presents a clear flight risk, confinement in United States facilities is more in accord with overall United States policy than is turning the accused over to the foreign government. Of course the accused could hardly complain of incarceration in United States facilities. Even with the logistic, moral, and legal support provided, foreign prisons are almost uniformly far more unpleasant for the average American citizen than would be a United States facility.

the Japanese procurator after he left the country without permission. Later, at his own request, the accused asked for release and the Japanese procurator agreed to a work release. In accordance therewith, the accused was released from custody and placed on base restriction. When the Japanese court imposed sentence, the accused was released from restriction even though military criminal charges were pending. It is thus evident that the confinement and restriction here were carried out solely at the request of the host nation in accordance with the agreements between the governments of the United States and Japan.

I decline to go further than the facts presented to answer our specified issues, since to do so would require an incursion into Executive diplomatic areas which are beyond our purview.[16] I note in passing that our resolution of the fourth-amendment aspects of this matter would not, in other situations, necessarily resolve possible fifth-amendment considerations. For example, while the accused's confinement here was relatively brief[17] and the Japanese judicial processes were reasonably expeditious, such might not always be the case, and the extended confinement of an accused could raise both fourth-and fifth-amendment problems. Therefore, to protect against excessive restraint where foreign criminal processes may become unduly prolonged, I urge the Departments of Defense and State to adopt procedures that, at a minimum, would provide for periodic reviews and reports of confinements such as this, via military channels, to the United States embassies involved. The military channels used could be the same as, or similar to, those used now to report the status of foreign criminal cases in which United States servicepersons are involved. In this way, American ambassadors could use diplomatic channels to expedite trials when such action is deemed appropriate, and, thus, relieve military commanders of the unpleasant dilemma of having to implement what they consider to be unnecessarily extended periods of confinement caused by delays in foreign judicial processes. I

16. One of the troublesome areas is whether some form of preconfinement hearing is required. *See Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Courtney v. Williams*, 1 M.J. 267 (C.M.A. 1976). The Army regulation requires a hearing by a magistrate. However, this procedure seems redundant at least to the extent that the magistrate must determine whether probable cause exists to believe that the accused committed the crime. Obviously, by its indictment the foreign government has already decided the question. The second portion used to determine if confinement is warranted also potentially places the magistrate in conflict with the commander. *Michigan v. Doran*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978), concerns the sort of hearing permissible by the asylum state when served with a request for extradition by the demanding state. There the Court held that

the courts of the asylum state are bound to accept the demanding state's judicial determination since the proceedings of the demanding state are clothed with the traditional presumption of regularity.

*Id.* at 290, 99 S.Ct. at 536. We recognize that extradition between states of the United States is not the same as "turning over" under an international agreement; however, some parts of the principle would apply. We simply cannot mandate any particular procedure to cover such situations.

17. In light of our determination that pretrial confinement was imposed at the request of the foreign government, we need not further consider granted issue III. In this regard our decision in *Butler v. Kilcline et al.*, 2 M.J. 209 (C.M.A. 1977), is apposite. There the accused brought a petition for habeas corpus challenging the authority of the Navy to confine him pending trial on charges of violating Philippine law. We dismissed the application with this language:

Because the petitioner no longer is being held for trial by court-martial and because the petitioner is being confined exclusively pursuant to the provisions of a military bases agreement between the Republic of the Philippines and the United States, it is, by the Court, this 21st day of January, 1977,

ORDERED:

That the Petition for Writ of Habeas Corpus or Other Extraordinary Relief be, and the same is, hereby dismissed.

Thus, we have previously recognized the authority of United States authorities to confine military persons pursuant to a request of a foreign government pending disposition of foreign criminal charges. This also disposes of that part of the speedy-trial issue related to the 92 days the accused was confined at the request of Japanese authorities.

do not, however, presume to dictate such procedures since the matter is best left to those elements of the government that have the most expertise and greatest authority in protecting and insuring the rights of United States servicepersons stationed abroad.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

EVERETT, Chief Judge, with whom FLETCHER, Judge, joins (concurring in the result):

I

When an American servicemember is court-martialed, the effect of any pretrial confinement may be significant. For example, it can give rise to a right to dismissal of charges for lack of speedy trial, *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971); and to entitlement to administrative credit on any sentence to confinement that may be adjudged by the court-martial, *United States v. Allen*, 17 M.J. 126 (C.M.A. 1984); *United States v. Suzuki*, 14 M.J. 491 (C.M.A. 1983). If the confinement is illegal, certain other consequences may flow as well; for instance, the illegality may taint the admissibility of statements the accused made during the period of confinement. *Cf. Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

Even if an accused's confinement before his trial by court-martial is occasioned by charges pending in a foreign court, the illegality of his confinement may be relevant to the court-martial proceedings. For example, whether Murphy was being confined illegally by American military authorities is a factor to be considered in determining whether the court-martial charges

should be dismissed for denial of speedy trial, and whether his pretrial statement was inadmissible. Therefore, contrary to the Government's contention, I conclude that this Court must deal with the question of the legality of appellant's confinement based on the charges pending against him in a Japanese court.

I identify several stages at which an American servicemember might be confined by military authorities because of alleged offenses against the host country: (a) before formal charges have been filed; (b) after charges have been preferred but before trial in the foreign court; (c) after trial, but while an appeal is pending; and (d) after trial, conviction, and imposition of a sentence to confinement. Each situation requires separate analysis.

As the principal opinion observes, an agreement between the United States and Japan provides that "[t]he custody of an accused member of the United States armed forces or the civilian component over whom Japan is to exercise jurisdiction shall, if he is in the hands of the United States, remain with the United States until he is charged by Japan."[1] Under this provision the United States has the primary right to "custody" of the accused servicemember until foreign charges are preferred.

By negative implication, this same provision of the agreement with Japan grants to *that* country the primary right to custody *after* charges are preferred against the servicemember in a Japanese court. Since international agreements should be viewed as subject to obligations of good faith, the right of the Japanese to custody after charges are preferred imposes on the United States a commensurate duty to take no action that would interfere with that right. This duty is especially clear since, under accepted rules of international law[2] and

---

1. Art. XVII, para. 5(*c*)—Agreement under Article VI of the Treaty of Mutual Cooperation and Security Between the United States of America and Japan, Regarding Facilities and Areas and the Status of United States Armed Forces in Japan, Jan. 19, 1960, Senate Executive E, 86th Cong., 2d Sess. 81 (1960); *see also* 11 U.S.T. 1652, 1665, T.I.A.S. No. 4510.

2. "A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction. The Schooner Exchange v. M'Faddon, 7 Cranch 116, 136, 3 L.Ed. 287." *Wilson v. Girard*, 354 U.S. 524, 529, 77 S.Ct. 1409, 1412, 1 L.Ed.2d 1544, 1548 (1957).

absent any agreement to the contrary, the host country would have the primary right to custody of a servicemember of a visiting force if he was suspected of violating the criminal laws of the host country. Moreover, the duty to respect the right of the host country continues until its criminal proceedings have been completed and have resulted finally in conviction or acquittal.

In view of Japan's rights under international law and under its agreement with the United States, military authorities may not transfer a servicemember out of the country without the consent of its government, if to do so would injure Japan's primary right to custody of the servicemember at some later time when charges are filed. Furthermore, if military authorities have reason to believe that a servicemember suspected of crimes against the host country may take flight unless they impose some restraint on him—*e.g.*, restriction to specified limits, arrest in quarters, or confinement—[3] then they may impose that restraint in order to assure performance of the duty owed by the United States.

My conclusion in this regard does not depend on the Uniform Code of Military Justice and the Manual for Courts-Martial, which are silent with respect to confinement of servicemembers who are facing charges in foreign courts. Instead, I find ample authority for such action in the international agreements which the United States has entered into with Japan and other countries. As the principal opinion points out, such agreements have been judicially treated as self-executing and so have been held to provide an adequate basis for ordering a servicemember to travel from the United States to a foreign country in order to stand trial there.[4] Under the same rationale, those agreements furnish an adequate basis for action, such as the imposition of restraint, which a servicemember's commander may consider reasonably necessary in order to assure that he will be available for trial in the courts of the host country.

Either party to a status-of-forces agreement may waive its primary jurisdiction to try an offense which violates the laws of both countries. *Wilson v. Girard*, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). The same principle would seem to apply to waivers of a primary right to custody pending trial. The United States has consistently followed the policy of requesting waivers of a host country's primary jurisdiction to try offenses. Indeed, this policy is rooted in the Senate's Reservation to the original North Atlantic Treaty Organization Status of Forces Agreement. *See* Senate Resolution of July 15, 1953, 99 Cong. Rec. 8780, *reprinted* at 4 U.S.T. 1828–29. A practice of requesting waivers of a host country's primary right of custody prior to trial would seem to be the logical corollary to seeking waivers of that country's primary jurisdiction to punish the crime. Appellant's record of trial makes clear that this practice is widespread.

Apparently, Japan frequently waives its primary right of custody, just as it did with respect to Murphy. Presumably, this waiver is in reliance on a reasonable expectation that American military authorities will make the accused servicemember available for trial. This reliance by the host country provides an additional ground for imposing on American military authorities the duty of assuring by all reasonable means that the accused is present later for court proceedings in the host country. Indeed, unless this duty is performed, future waivers are unlikely. As noted earlier, the means available to the commander to assure the accused's presence include the imposition of appropriate restraint—restriction, arrest, or confinement—until the case is closed in the foreign courts.

---

**3.** Obviously, this confinement must be under conditions akin to those for confining a servicemember prior to trial by court-martial.

**4.** *See, e.g., Williams v. Rogers*, 449 F.2d 513 (8th Cir. 1971), *cert. denied*, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972); *United States ex rel. Stone v. Robinson*, 309 F.Supp. 1261 (W.D. Pa.), *aff'd*, 431 F.2d 548 (3d Cir. 1970); *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir.), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).

After conviction, the host country may authorize an appeal from the judgment of its trial court; and under the law of the host country, an accused may be allowed to delay serving a sentence to confinement until his appeal has been completed.[5] If, during this period, the accused servicemember is allowed by the foreign country to remain out of jail pending completion of appellate review, American military authorities will have an obligation to keep the servicemember under whatever restraint might be necessary to assure his presence for further proceedings in the courts of the host country.

At some point after conviction, the accused servicemember—unless successful on appeal—must begin serving any sentence to confinement adjudged by the foreign court. Even in this situation, if the host country is willing to allow the sentence to be served in an American confinement facility, I conclude that an adequate basis exists for American military authorities to hold the convicted servicemember in confinement for the period of the sentence adjudged by the foreign court. My conclusion is based on the policy manifested in American status-of-forces agreements as to criminal jurisdiction over American servicemembers—namely, the policy that our nation's servicemembers be dealt with by American military authorities to the greatest extent that our treaty partners will allow. An additional basis for my conclusion is found in the policy reflected in treaties entered into by the United States which provide for reciprocal transfers of prisoners with other nations. *See, e.g.,* Treaty with Mexico on the Execution of Penal Sentences, Nov. 25, 1976, 28 U.S.T. 7399, T.I.A.S. No. 8718.

Although I find a legal basis for American military authorities to arrange with foreign officials for a servicemember convicted in a foreign court to serve his sentence in a military confinement facility, I reserve judgment as to whether, under those circumstances, the servicemember would be entitled to insist that he be incarcerated in a foreign penal facility, rather than in an American military confinement facility.

Because authority for confinement based on pending foreign charges is not found in the Uniform Code and the servicemember is not confined by reason of any suspected violation of the Code, no reason exists to include this time in computing pretrial confinement for purposes of *United States v. Burton, supra.* Moreover, the time in confinement on foreign charges affords no basis for credit on the sentence to confinement adjudged subsequently by a court-martial. *See United States v. Allen, supra.* However, the existence of such confinement is a permissible factor for a court-martial to consider in determining an appropriate sentence, ascertaining the prejudice to an accused because of delays in commencing his trial by court-martial, or deciding the voluntariness of a statement made while the accused is in such confinement.

The principal opinion suggests that it would be desirable for some type of periodic review to take place as to persons held in pretrial confinement. I would go further. Just as a hearing before a neutral and impartial officer must be provided an accused person who awaits trial by court-martial, *cf. United States v. Heard,* 3 M.J. 14 (C.M.A. 1977); *Courtney v. Williams,* 1 M.J. 267 (C.M.A. 1976), so, too, an accused must be afforded an opportunity for a hearing if he is being held in confinement because of charges pending in a foreign court. Indeed, the Army already provides such a hearing.

The scope of inquiry by the hearing officer is limited, however. Just as a court considering an extradition warrant from another state may not go behind the demanding state's judicial determination that probable cause exists, *cf. Michigan v. Doran,* 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d

---

5. In *United States v. Miller,* 16 M.J. 169 (C.M.A. 1983), appellant had appealed his conviction by a Korean trial court; but apparently he was allowed to remain in the custody of American military authorities while this appeal took place.

521 (1978), a hearing officer may not examine the legal grounds for the charges filed against a servicemember in the courts of the host country. However, the hearing officer should determine whether confinement is necessary to assure the servicemember's presence for the foreign court proceedings.[6] Of course, in so doing, he must give great weight to the determination by the accused's commander that confinement is necessary, because the commander is the agent responsible for meeting the United States' treaty obligation. If the accused is ordered released from confinement, the commander may appropriately give timely notice of that order to the host country, so that it can take custody of the accused if it believes such action to be necessary in order to protect its rights to exercise jurisdiction.

Undoubtedly, in most instances a hearing officer will not disturb a commander's decision to keep a servicemember in confinement in connection with pending charges in a foreign court; but I am convinced that sometimes the hearing may benefit an accused. In this connection, I note that in the case at bar Lieutenant Colonel Robert W. Gehring, a Marine judge advocate familiar with the administration of the Status of Forces Agreement with Japan, testified:

Q. Can you recall any Japanese request to confine an individual that was not followed by the Marines here on Iwakuni?

A. I can recall, I believe two cases, in which they requested restriction and we placed the people in confinement. I can recall one other case in which the man was in confinement, the procurator indicated he had no objection to a work-release program, but the command did, and the man was not placed on a work-release program, and another case in which the man was on a work-release program, the procurator had no objections, but because of the man's conduct on the work-release program it was terminated.

From this testimony, it would appear that occasionally American military authorities may have imposed more severe restraint than was requested by the Japanese. Certainly in such cases the hearing officer might wish to consider directing that the restraint imposed be mitigated.

Although in my view military authorities should be required to provide some opportunity for a hearing for the servicemember who is confined because of foreign charges, I would apply this requirement prospectively in other cases—just as we have done in similar situations. *See United States v. Lynch,* 13 M.J. 394, 397 (C.M.A. 1982). In the instant case, I am convinced that appellant was not prejudiced in any way by the absence of such a hearing.

Accordingly, with respect to the issues concerning pretrial confinement on which we granted review in this case, I give these responses:

A. International obligations assumed by the United States under agreements with Japan authorized American military authorities to confine appellant.

B. Confinement under such circumstance may be imposed by a military commander on the basis of a request from the host country or, even without a request, on the basis of the commander's determination that confinement of the accused is necessary to assure his presence for foreign criminal proceedings, pursuant to the obligations of the United States to the host country.

C. Continued existence of the need for confinement by reason of pending foreign charges should be examined by a neutral and impartial official at the request of the accused.

D. In such an examination, no inquiry can be undertaken as to the grounds for the foreign charges but, instead, only as to their nature and pendency; however, the hearing officer should determine whether continued confinement is reasonably required in order to assure the

---

**6.** Also, the hearing officer should determine whether the conditions of confinement are appropriate for a person who has not yet been tried. *See* n. 3, *supra.*

accused's presence for the foreign court proceedings.

E. The time spent in pretrial confinement with respect to foreign charges should not be considered in determining the running of a period of government accountability to bring an accused to trial on a military charge that may also be preferred. *See United States v. Burton, supra.*

F. No credit on appellant's sentence to confinement is available with respect to the time spent in confinement because of the Japanese charges. *Cf. United States v. Allen, supra.*

## II

Appellant made a statement to Japanese police authorities which, over vigorous objection, was received in evidence at his trial. Prior to making that statement, appellant had been informed by various persons—both American and Japanese—that things would go better for him in the Japanese courts if he cooperated with the police and made a statement. Also, the Marine officer who advised him about the Japanese proceedings led Murphy to believe that if he were prosecuted by the Japanese, he would not be prosecuted by American military authorities.

To some extent, this advice received by appellant was quite correct, since, under the agreement with Japan, he could not be court-martialed subsequently for the *same* offense for which he had already been tried in a Japanese court. *See, e.g., United States v. Stokes,* 12 M.J. 229 (C.M.A. 1982). Thus, there would be no occasion for use in an American court-martial of any statement he made to the Japanese, because the American trial would be barred by the agreement between the United States and Japan.

However, this advice to Murphy failed to mention the scenario that later followed in his case: He was convicted in the Japanese court for one drug offense, but then was tried by an American court-martial for *another* drug offense which was related, but was not the same as the first and so did not come within the treaty prohibition. *Cf. United States v. Green,* 14 M.J. 461 (C.M.A. 1983). In the trial by court-martial, appellant's statement to Japanese was used against him.

Even though the advice Murphy received proved to be incomplete, there is no indication that an intent existed to deceive him, and the Marine officer who provided the advice did not purport to be acting as his attorney in the Japanese proceedings. Moreover, appellant was never expressly promised that a statement made to the Japanese could not be used against him in a trial by court-martial. Under these circumstances, I agree with the principal opinion that the admissibility of the statement was not destroyed by the omissions in the advice furnished to appellant.

Several remarks were made to Murphy that he would benefit in the Japanese courts if he made a confession. I can hardly criticize Japanese judges who reward cooperation by defendants, since a similar practice is common in American courts. Plea bargaining—a familiar practice, which has not only been accepted, *cf. Parker v. North Carolina,* 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); but even acclaimed, *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)—involves a reward for a defendant who cooperates with the prosecution by pleading guilty and thereby waiving important rights, such as self-incrimination, jury trial, and confrontation. Indeed, in *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), the Supreme Court went even further in ruling that a heavier sentence could be imposed because a defendant had *not* cooperated with the authorities by identifying other persons involved in drug activity.

If the Japanese courts reward with lighter sentences accused persons who confess their guilt, certainly no fault can be found in informing Murphy that this is their policy. However, I am concerned about the effect of this information on the admissibility of his statement. Cases like *Garrity v.*

*New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), make clear that, even though a police officer or other public servant may be compelled either to provide self-incriminating information or be dismissed from his job, any information extracted under this threat cannot be used later in a criminal prosecution of the person who furnished it. Similarly, *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), upheld grants of testimonial immunity on the premise that, although someone may be compelled to give self-incriminating testimony, that testimony cannot be used against him in a criminal trial. *See also Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

These cases involved compulsion to testify exerted on a witness by state or federal authorities. On the other hand, the pressure on Murphy to confess emanated from foreign officials. Often the evidence obtained by foreign investigators is not subject to the same limitations on admissibility that would apply if American investigators had been involved. *United States v. Jones,* 6 M.J. 226 (C.M.A. 1979) (interrogation); *United States v. Morrison,* 12 M.J. 272 (C.M.A. 1982) (search and seizure). Indeed, in some respects, the treatment of such evidence is like that accorded to evidence seized by a private individual. *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

In dealing with the voluntariness of a confession, it is unclear whether any distinction can be made because the investigator is an official of a foreign government. In *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), the Supreme Court ruled that an admission by the defendant in response to questioning by a Canadian detective had been involuntary, so, under the fifth amendment, it should not have been received in evidence; and the Court in no way indicated that different rules would apply to the admissibility of the statement obtained by this individual because he was not an American official. However, the defendant apparently was being held for the Consul General of the United States as a suspect in a murder aboard an American ship bound from Boston to South America; so, on agency principles, the foreign detective might have been deemed an agent of the United States in his interrogation.

In *Bram,* the Supreme Court discussed a number of English and American precedents, some of which involved exclusion of confessions because of inducements seemingly much less than those extended to Murphy in the case at bar. Moreover, *Bram*'s discussion of voluntariness is in these rather sweeping terms from 3 Russell on Crimes 478:

> "But a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor *obtained by any direct or implied promises, however slight,* nor by the exertion of any improper influence.... A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

168 U.S. at 542–43, 18 S.Ct. at 187 (emphasis supplied).

In *Brady v. United States, supra,* which involved the voluntariness of a guilty plea, *Bram* was distinguished in this way:

> *Bram* is not inconsistent with our holding that Brady's plea was not compelled even though the law promised him a lesser maximum penalty if he did not go to trial. Bram dealt with a confession given by a defendant in custody, alone and unrepresented by counsel. In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess. But *Bram* and its progeny

did not hold that the possibly coercive impact on a promise of leniency could not be dissipated by the presence and advice of counsel, any more than *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), held that the possibly coercive atmosphere of the police station could not be counteracted by the presence of counsel or other safeguards.

397 U.S. at 754, 90 S.Ct. at 1472 (footnote omitted). Of course, this distinction does not aid the Government here, since Murphy was alone, unrepresented by counsel, and undergoing interrogation by representatives of a foreign power.

However, as a Court of Appeals has observed, the language of *Bram* "has never been applied with the wooden literalness urged upon us by appellant." *United States v. Ferrara,* 377 F.2d 16, 17 (2d Cir. 1967); *see also United States v. Ballard,* 586 F.2d 1060 (5th Cir. 1978); *United States v. Barfield,* 507 F.2d 53 (5th Cir. 1975), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975). Thus, it seems appropriate to examine further whether, without ignoring *Bram,* the reception in evidence of Murphy's statement is supportable.

At common law, the inadmissibility of involuntary confessions probably was predicated initially on their perceived untrustworthiness. As appears from the cases discussed in *Bram v. United States, supra,* some courts later expanded this rationale and also justified exclusion by distaste for unjust methods of interrogation and the exercise of arbitrary power by those in authority. *See also Brown v. Walker,* 161 U.S. 591, 596, 16 S.Ct. 644, 646, 40 L.Ed. 819, 821 (1896).

The Supreme Court has emphasized that exclusion of an involuntary confession under the due process clause of the fourteenth amendment must take place regardless of the confession's trustworthiness. *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). As the Court explained in *Jackson v. Denno,* 378 U.S.

368, 385–6, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908 (1964):

It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed *where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,"* Blackburn v. Alabama, 361 U.S. 199, 206–207, 80 S.Ct. 274 [280] 4 L.Ed.2d 242, 248, and because of "the deep-rooted feeling that *the police must obey the law while enforcing the law;* that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York,* 360 U.S. 315, 320–321, 79 S.Ct. 1202, 1205–1206, 3 L.Ed.2d 1265, 1270.

(Emphasis supplied.)

The references in *Jackson* to "an agency of the government" and "the ... feeling that the police must obey the law while enforcing the law" suggest that, insofar as the exclusion of involuntary statements is concerned with protecting values other than assuring trustworthiness of evidence, those values relate to *official* misconduct. However, if a private individual has obtained a confession from a defendant, it would seem that exclusion of the statement can be justified only if it was untrustworthy. Certainly, exclusion of such confession will not improve official conduct in the future or have any impact on police behavior—the dangers addressed in *Jackson v. Denno, supra.*

The same reasoning would seem to apply to exclusion of statements obtained from an American servicemember by foreign interrogators. Exclusion of the evidence in an American court-martial will have no effect on the future conduct of the foreign officials. It will not alter the behavior of foreign interrogators. Perhaps exclusion

can be justified on symbolic grounds if the foreign methods of interrogation are uncivilized—such as torture. However, it appears to me that, where statements are made to foreign officials by American servicemembers, the criterion for admissibility must be the trustworthiness of the statement which is being attacked as involuntary.

Accordingly, I must determine whether Murphy's statement was made under circumstances that require its rejection because it was not voluntary enough to be trustworthy. I recognize that he might have said anything, true or false, in order to obtain a lighter sentence in the Japanese courts—especially since he did not anticipate prosecution by court-martial. Moreover, he had not been provided an attorney and, apparently, was not entitled to one under Japanese law at the time of his statement. Nonetheless, when I consider all the evidence that was offered as to voluntariness and look at the "totality of the circumstances," I cannot conclude that, as a matter of law, the confession was so involuntary as to be untrustworthy. Therefore, albeit with some misgivings, I concur in the principal opinion's conclusion that appellant's confession to the Japanese was admissible at his subsequent court-martial.